WILLIAM EMMETT DWYER, ESQ.
Disability Rights New Jersey, Inc.
210 South Broad Street, Third Floor
Trenton, NJ 08608
Tel: (609) 292-9742
Fax: (609) 777-0187

ROBERT COHEN, ESQ. (*pro hac vice* pending)
SHIVA FAROUKI, ESQ. (*pro hac vice* pending)
MICHAEL DAVID REISMAN, ESQ. (*pro hac vice* pending)
ALEXANDRA P. KOLOD, ESQ. (*pro hac vice* pending)
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Tel: (212) 446-4800
Fax: (212) 446-6460

*Attorneys for Plaintiff Disability Rights New Jersey, Inc.*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **DISABILITY RIGHTS NEW JERSEY, INC.,** a New Jersey non-profit corporation, | : | Civil Action No. |
| | : | _____ |
| Plaintiff, | : | |
| | : | |
| - against - | : | COMPLAINT |
| | : | |
| **JENNIFER VELEZ**, in her official capacity as Commissioner, State of New Jersey Department of Human Services, and | : | |
| | : | |
| **POONAM ALAIGH**, in her official capacity as Commissioner, State of New Jersey Department of Health and Senior Services, | : | |
| | : | |
| Defendants. | : | |
| | : | |

Plaintiff Disability Rights New Jersey, Inc. ("DRNJ") brings this suit against the Defendants on behalf of its constituents who presently are or will be detained at or admitted to psychiatric hospitals in New Jersey and to whom psychotropic medication is being or will be administered involuntarily on a non-emergency basis.  All constituents are individuals with disabilities, have a record of disabilities, or are perceived to have such disabilities, for purposes of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973.

## PRELIMINARY STATEMENT

1.      In New Jersey today, people in psychiatric hospitals can be drugged with massive doses of mind-altering medication, sometimes administered by painful intramuscular injection, without any meaningful medical oversight and without adequate due process of law.

2.      Undeniably, each person has a fundamental right to refuse the forced administration of psychotropic drugs and to be informed of and participate in decisions regarding her health care.  Psychotropic drugs can provide symptom relief but they can also have powerful negative effects on a person's ability to think and feel, and on her sense of self.  They can also cause unpredictable, disabling, and sometimes incurable disorders, including memory loss, akathisia (repetitive, irresistible tapping-type movements), and neuroleptic malignant syndrome, a condition that can be fatal.  One in four patients receiving long-term treatment with antipsychotic drugs contracts tardive dyskinesia, a disease characterized by involuntary writhing movements of the facial muscles, tongue, trunk, and limbs.

3.      The only procedural protection a patient in a New Jersey State psychiatric hospital has against these dangers is a decades-old peer review procedure known as the "Three-Step Process."  The three informal steps require merely (a) a psychiatrist's decision to medicate a patient involuntarily; (b) the treatment team's approval of the decision; and (c) the hospital medical director's approval of the decision.  In both theory and practice, however, the Three-

2

Step Process is a rubber stamp for a psychiatrist's decision to forcibly medicate a patient. Indeed, under the Three-Step Process, psychiatric patients in New Jersey who do not want to be forcibly medicated lack any right to legal representation or even a hearing before a decision-maker who is independent of the hospital. Additionally, these patients have no meaningful right or ability to appeal a forcible medication decision. Remarkably, the Three-Step Process does not even provide these patients with an advocate who is charged with advancing their expressed preferences regarding medication.

4.     Thus, under the Three-Step Process used in New Jersey State hospitals today, a psychiatrist can order the forcible injection of a patient whom the psychiatrist knows to be competent to make medical decisions, merely because the patient disagrees with the psychiatrist over the need for medication. Worse, New Jersey psychiatric hospitals may forcibly medicate patients who are healthy enough to leave the hospital but are simply waiting for housing in the community.

5.     As inadequate as the Three-Step Process may be, it does not appear to be used at all in New Jersey's county and private psychiatric hospitals. Thus, patients in those institutions lack even the illusory promise of the due process protections supposedly offered to patients in State institutions.

6.     An investigation by the United States Department of Justice recently concluded that medication practices in New Jersey's largest State psychiatric hospital substantially deviate from generally accepted professional standards. Such dangerous practices, including polypharmacy (the administration of massive doses of multiple powerful psychotropic medications to the same patient), have put the health and lives of psychiatric patients at risk.

7.     Thirty years ago, a Court in this District attempted to forge a solution to the problem of involuntary medication that would protect patients' rights and safety.  But since then, New Jersey has moved backwards, and now affords fewer rights to psychiatric patients than it did three decades ago.  Yet, over the same period, the federal government and most other states have greatly expanded patients' rights.  Indeed, more than two-thirds of Americans live in states that provide hearings to people in psychiatric hospitals who refuse psychotropic medication.

8.     Shockingly, New Jersey treats prison inmates far better than it does patients in psychiatric hospitals.  Prison inmates in New Jersey are given the right to challenge the unwanted administration of psychotropic medication in a hearing before an independent and impartial decision-maker, with the prison bearing the burden to prove that such medication is necessary.  These fundamental protections, which provide basic guarantees of due process, are completely absent for each and every individual in New Jersey psychiatric hospitals.

9.     The harrowing experiences of constituent representatives — who are not parties to the case but have sought legal assistance from Plaintiff DRNJ — provide but a few examples of the appalling treatment of psychiatric patients in New Jersey.[1]  For example, constituent P.D., who was trained as a scientific glassblower and is a patient at Ancora Psychiatric Hospital, has been given many different psychotropic drugs that have caused him to experience painful side effects.  The medications caused P.D. to experience such severe akathisia (restlessness) that the skin on his legs was worn from his constantly pacing the halls of the hospital ward.  P.D. experienced forced injections of Haldol to be like torture.   Further, the medications have

---

[1]    The constituent representatives are referred to by their initials to maintain their privacy and the confidentiality of their records and files in this proceeding.  The Defendants will be provided with the actual identities of the constituent representatives upon entry of a protective order and execution of a confidentiality agreement.

prevented P.D. from doing the things he enjoys doing on a daily basis, such as reading, sketching and writing. Moreover, hospital staff never explained to P.D. that he has a right to refuse medication.

10.     Similarly, constituent A.H., a woman who has worked in a number of jobs including as a pharmacy technician, was recently hospitalized at Trenton Psychiatric Hospital. Although she raised serious concerns with hospital staff about the debilitating side effects of the psychotropic medication prescribed for her, she reluctantly agreed to take the medication orally only after being threatened by staff with forced injections. A.H. also received forced injections of medication at private psychiatric hospitals in New Jersey, but was never advised by any New Jersey hospitals of her right to refuse medication.

11.     This case seeks to compel Defendants to respect the human dignity and basic rights of individuals in New Jersey's psychiatric hospitals. Accordingly, Plaintiff, on behalf of its constituents, seeks declaratory and injunctive relief requiring Defendants to provide patients who refuse the non-emergency administration of psychotropic medication with meaningful due process protections — including legal counsel, notice and a hearing before a judicial decision-maker — before such persons may be involuntarily medicated. The hospital should have the burden to show that medication is likely to be effective and that side effects and less intrusive alternative treatments have been considered.

## THE PARTIES

### Plaintiff

12.     Plaintiff Disability Rights New Jersey, Inc. ("DRNJ" or "Plaintiff"), a non-profit corporation, is the federally funded agency designated since 1994 to serve as New Jersey's protection and advocacy system for people with disabilities. Pursuant to this designation, DRNJ serves as the agency to implement, on behalf of the State of New Jersey, the Protection and

Advocacy System for Individuals with Mental Illness established under 42 U.S.C. §§ 10801-10807 (1991).

13.   DRNJ is part of a nationwide network of protection and advocacy agencies located in all fifty states, the District of Columbia, Puerto Rico, and the federal territories. The protection and advocacy system comprises the nation's largest provider of legally based advocacy services for people with disabilities.

14.   DRNJ has statutory authority to pursue legal, administrative and other appropriate remedies to ensure the protection of individuals with mental illness who are or will be receiving care and treatment in New Jersey pursuant to the Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 10801 *et seq*.

15.   Persons with mental illness are the functional equivalent of members of DRNJ for purposes of associational standing.  These persons are the direct and primary beneficiaries of DRNJ's activities, which include the prosecution of this litigation.

16.   DRNJ's constituents are involved in all levels of the organization.  Pursuant to federal law, the chairperson and at least 60% of the membership of DRNJ's Advisory Council, which guides DRNJ's policies and procedures, is "comprised of individuals who have received or are receiving mental health services or family members of such individuals."  42 U.S.C. § 10805(a)(6)(B).

17.   DRNJ is pursuing this action to protect and advocate for the rights and interests of "individuals with mental illness" as that term is defined in 42 U.S.C. § 10802.  Specifically, DRNJ brings this action on behalf of individuals with mental illness who are or will be confined in psychiatric hospitals within New Jersey and who are or will be prescribed psychotropic

medication.  Psychotropic medications are drugs that have a direct effect on the central nervous system and can modify emotion, cognition and behavior.

18.     Plaintiff's constituents have each suffered injuries, or will suffer such injuries, that would allow them to bring suit against Defendants in their own right.

**<u>Defendants</u>**

19.     Defendant Jennifer Velez is Commissioner of the Department of Human Services of New Jersey, a public entity covered by, *inter alia*, Title II of the Americans with Disabilities Act ("ADA").  42 U.S.C. § 12131(1) (1990).

20.     Defendant Velez is ultimately responsible for ensuring that New Jersey operates its service systems in conformity with the constitutions of the United States and New Jersey and with the ADA and Section 504 of the Rehabilitation Act ("Section 504").  29 U.S.C. § 794(a) (2002).  She is sued in her official capacity.

21.     The Department of Human Services operates state inpatient psychiatric facilities and is responsible for discharge planning, placement, and follow up for individuals residing in such facilities.

22.     The Department of Human Services also operates developmental centers for individuals with developmental disabilities.

23.     The Department of Human Services is a recipient of federal funds and administers state mental health programs.

24.     Defendant Poonam Alaigh is Commissioner of the Department of Health and Senior Services of New Jersey ("DHSS"), a public entity covered by, *inter alia*, Title II of the Americans with Disabilities Act ("ADA").  42 U.S.C. § 12131(1).

25.     Defendant Alaigh is ultimately responsible for ensuring that all hospitals in New Jersey are operated in conformity with the constitutions of the United States and New Jersey and with the ADA and Section 504.  She is sued in her official capacity.

26.     DHSS regulates a wide range of health care settings for quality of care, such as hospitals, nursing homes, assisted living residences, ambulatory care centers, home health care, medical day care and others.

27.     DHSS also licenses hospitals, including psychiatric hospitals that provide comprehensive specialized diagnosis, care, treatment and rehabilitation on an in-patient basis for patients with primary psychiatric diagnoses.

28.     DHSS is a recipient of federal funds.

## JURISDICTION

29.     This action is brought pursuant to the Constitution of the United States and 42 U.S.C. § 1983.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (1980) (for civil actions arising under the laws of the United States) and 28 U.S.C. § 1343(a)(3)&(4) (1979) (for actions under laws providing for the protection of civil rights).

30.     Plaintiff seeks declaratory and injunctive relief under 28 U.S.C. § 2201 *et seq.* (1993).

## VENUE

31.     Venue is proper in the United States District Court for the District of New Jersey pursuant to 28 U.S.C. § 1391(a) (2002) because it is the district in which the Plaintiff's claims arose and all of the parties reside in this district.  Trenton is the proper vicinage because it is where the Defendants have their principal offices and where State policy is made.

## FACTS

### I.    Psychiatric Institutions in New Jersey

32.    Approximately three thousand individuals are hospitalized in public and private psychiatric facilities in New Jersey.  The majority of these individuals are committed on involuntary status.

33.    Defendant Department of Human Services operates five inpatient psychiatric hospitals in New Jersey, the so-called "State hospitals":  (a) Ancora Psychiatric Hospital ("Ancora") in Winslow Township, which serves a general adult population, elderly and forensic patients, and people who have been dually diagnosed to have both a developmental disability and a mental illness; (b) Greystone Park Psychiatric Hospital ("Greystone") in Morris Plains, which serves adults; (c) Hagedorn Psychiatric Hospital ("Hagedorn") in Glen Gardner, which serves general and elderly populations; (d) Trenton Psychiatric Hospital ("Trenton Psychiatric") in Trenton, which serves adults; and (e) Ann Klein Forensic Center in Trenton, which serves people who have been determined by the courts to be not guilty by reason of insanity or incompetent to stand trial, or who require special security measures due to the nature of their illness.  These institutions had a combined average daily census of approximately 1,800 patients in May 2010.

34.    Defendant Department of Human Services also funds most of the cost of indigent inpatient care at six "County" psychiatric units and hospitals, including:  (a) Bergen Regional Medical Center in Paramus; (b) Buttonwood Hospital in Pemberton Township; (c) Camden County Health Services Center in Blackwood; (d) Essex County Hospital Center in Cedar Grove; (e) Meadowview Hospital in Secaucus; and (f) Runnells Hospital in Berkeley Heights.  Together, these hospitals have approximately 750 patient beds.

35.    Defendant DHSS licenses all hospitals in New Jersey, including the above-listed State and County psychiatric hospitals as well as other facilities such as the following:  (a)

9

Ramapo Ridge Psychiatric Hospital in Wyckoff, which has 58 psychiatric beds; (b) Hampton Behavioral Health Center in Westhampton, which has 100 psychiatric beds; (c) Saint Barnabas Behavioral Health Center in Toms River, which has 40 psychiatric beds; (d) East Mountain Hospital in Belle Mead, which has 16 psychiatric beds; (e) the Carrier Clinic in Belle Mead, which has 281 psychiatric beds; and (f) Monmouth Medical Center in Long Branch, which has 63 psychiatric beds.

## II.     Side Effects of Psychotropic Medications

36.     At the outset, it is important to understand that many patients rationally refuse psychotropic medication because of the dangerous side effects of such drugs.  There can be no dispute that psychotropic medications can be useful in controlling the symptoms of some forms of mental illness, in particular schizophrenia.  But there can also be no dispute that these medications frequently cause severe side effects, some of which can be irreversible.  Further, sometimes these medications fail to help patients.

37.     According to the National Institute of Neurological Disorders and Strokes of the National Institutes of Health, antipsychotic drugs can cause neuroleptic malignant syndrome, a life-threatening neurological disorder.[2]  Additionally, the National Institutes for Mental Health ("NIMH") has found that long-term use of antipsychotic medications can cause tardive dyskinesia, a potentially incurable and disfiguring condition that causes muscle movements a person cannot control.  For long-term psychiatric patients like Plaintiff's constituents, the chance of contracting tardive dyskinesia from psychotropic drugs is approximately one in four.  Gary Tollefson, et al., *Blind, Controlled, Long-Term Study of the Comparative Incidence of*

---

[2]   *See* http://www.ninds.nih.gov/disorders/neuroleptic_syndrome/neuroleptic_syndrome.htm.

*Treatment-Emergent Tardive Dyskinesia With Olanzapine or Haloperidol*, 154 AM. J. PSYCHIATRY 1248 (September 1997).  Moreover, a 2004 study found that, despite its high prevalence, psychiatrists documented the symptoms of tardive dyskinesia in only 5.5% of cases. Leonardo Cortese, et al., *Assessing and Monitoring Antipsychotic-Induced Movement Disorders in Hospitalized Patients: A Cautionary Study*, 49 CAN. J. PSYCHIATRY, 31, 34 (January 2004).

38.     Other side effects of psychotropic medications include increased risk of diabetes and high cholesterol, problems with physical movement such as rigidity, persistent muscle spasms, tremors and restlessness, drowsiness, dizziness, blurred vision, rapid heartbeat, sensitivity to the sun, skin rashes, menstrual problems for women, major weight gain, and changes in a person's metabolism.[3]

39.     One of the most common side effects of antipsychotic drugs is a condition known as akathisia, which is marked by uncontrollable physical restlessness and agitation and by interminable pacing, shaking of arms and legs, foot bouncing, and anxiety or panic.  Ironically, this side effect mimics symptoms of mental illness itself.   When even more antipsychotic medication is administered due to a psychiatrist's erroneous perception that the signs of akathisia are symptoms of disease, the patient's agitation and panic increase.  An opposite type of side effect is akinesia, which is typified by drowsiness and the need to sleep a great deal.

40.     An article published in the *Psychiatric Times* in 2007 noted that polypharmacy, the prescribing for a single person of more than one drug of the same chemical class (such as antipsychotics), is widely practiced despite little empirical support, and can result in serious adverse reactions and intensified side effects.  Further, using multiple antipsychotics at the same

---

[3]     *See* http://www.nimh.nih.gov/health/publications/mental-health-medications/complete-index.shtml.

time has been associated with increased death rates in patients with schizophrenia. Steven Kingsbury & Megan Lotito, *Psychiatric Polypharmacy: The Good, the Bad, and the Ugly*, 24 PSYCHIATRIC TIMES 32 (April 1, 2007).[4] Despite these dangers, many patients in New Jersey psychiatric hospitals — including the constituent representatives, whose stories are presented above (*see* Preliminary Statement) and in Section V below — are prescribed more than one antipsychotic drug at the same time.

41.     Indeed, Defendant Department of Human Services' own psychopharmacology guidelines, issued to and used by psychiatrists in State psychiatric hospitals, acknowledge that "use of [antipsychotic drugs] in combinations can lead to additive side effects, drug/drug interactions, difficulties when adjusting dosages, and adherence problems, in addition to increased costs." *New Jersey Division of Mental Health Services Psychopharmacological Practice Guidelines for the Treatment of Schizophrenia* (2005), at 3.[5]

42.     The "first generation" of antipsychotic drugs, developed in the 1950s, provided symptom relief for many people with schizophrenia, but also failed to help many others and caused the above-mentioned side effects, which in some cases were worse than the disorders the medications were intended to treat. Nevertheless, first-generation antipsychotics, such as Thorazine and Haldol, are still widely used today. Since the 1980s, however, a "second generation" of antipsychotics — the so-called "atypicals" — has been optimistically touted as better controlling the symptoms of schizophrenia while causing fewer side effects. Commonly prescribed second-generation antipsychotics include Seroquel, Risperdal, and Clozaril.

---

4       Available at http://www.psychiatrictimes.com/display/article/10168/53816.

5       Available at http://www.state.nj.us/humanservices/dmhs/consumer/NJDMHS_Pharmacological_Practice_Guidelines762005.pdf.

43.    Although second-generation antipsychotics provide symptom relief to many people with schizophrenia, a landmark study, known as Clinical Antipsychotic Trials of Intervention Effectiveness ("CATIE"), sponsored by NIMH and published in the *New England Journal of Medicine* in 2005, concluded that the second generation of antipsychotic drugs is no more effective than the first generation, and on the whole, causes as many side effects.  Jeffrey Lieberman et al., *Effectiveness of Antipsychotic Drugs in Patients with Chronic Schizophrenia*, 353 NEW ENG. J. MED. 1209 (Sept. 22, 2005).  The CATIE study thus debunked the myth that the second-generation drugs represent a "miracle" cure without side effects.

44.    The CATIE study was comprehensive and wide-ranging:  It involved more than 1,400 participants at 57 sites around the country over an 18-month period.  Overall, the "old" and "new" antipsychotic medications were comparably effective but all were associated with high rates of discontinuation due to intolerable side effects — such as abnormal weight gain — or failure to adequately control symptoms.  The CATIE study also found that movement side effects (rigidity, stiff movements, tremors, and muscle restlessness) associated with the older medications were seen just as frequently with the newer drugs as with the older ones.

45.    The results of the CATIE study were independently confirmed by the Cost Utility of the Latest Antipsychotic Drugs in Schizophrenia Study ("CUtLASS"), which was sponsored by the English National Health Service and published in the journal *Archives of General Psychiatry* in October 2006.  Peter Jones, et al., *Randomized Controlled Trial of the Effect on Quality of Life of Second- vs First-Generation Antipsychotic Drugs in Schizophrenia: Cost Utility of the Latest Antipsychotic Drugs in Schizophrenia Study (CUtLASS 1)*, 63 ARCH. GEN. PSYCHIATRY 1079 (Oct. 2006).  The CUtLASS study concluded that treatment outcomes, including quality of life as well as symptom-based measures, were no better for patients taking

second-generation antipsychotic drugs compared to those taking first-generation antipsychotics, and there was no difference in incidence of side effects.  In fact, there was a trend favoring slightly better outcomes for those taking first-generation antipsychotics over second-generation antipsychotics.

46.    The chief investigators of the CATIE and CUtLASS studies stated in the *British Journal of Psychiatry* in 2008 that

> the convergence in the results of these two trials is compelling.  . . .   It is worth reflecting on how crudely we often use antipsychotic drugs.  Polypharmacy, the prescribing of two or more antipsychotics in parallel, is widespread despite the lack of evidence to support it and the knowledge that it doubles costs and multiplies safety risks.  Off-label prescribing is common.  It is perhaps not surprising that, in the context of a severe, chronic illness, clinicians are tempted to resort to untested measures.

Shôn Lewis & Jeffrey Lieberman, *CATIE and CUtLASS: Can We Handle the Truth?*, 192 BRIT. J. OF PSYCHIATRY 161 (2008).

47.    Additional evidence that the second-generation antipsychotics are no more effective than — and produce just as many side effects as — the first-generation antipsychotics has been supplied by the NIMH-funded Treatment of Early-Onset Schizophrenia Spectrum ("TEOSS") studies, which focused on the treatment of children and adolescents with antipsychotic medications.  Studies published in the *American Journal of Psychiatry* in 2008 and in the *Journal of the American Academy of Child and Adolescent Psychiatry* in June 2010 concluded that the second-generation antipsychotics did not demonstrate superior effectiveness over first-generation antipsychotics and were associated with serious side effects, including abnormal weight gain and metabolic problems.   Linmarie Sikich, et al., *Double-Blind Comparison of First- and Second-Generation Antipsychotics in Early-Onset Schizophrenia and Schizo-affective Disorder: Findings From the Treatment of Early-Onset Schizophrenia Spectrum Disorders (TEOSS) Study*, 165 AM. J. PSYCHIATRY 1369 (2008); Robert Findling, et al., *Double-*

14

*Blind Maintenance Safety and Effectiveness Findings From the Treatment of Early-Onset Schizophrenia Spectrum (TEOSS) Study*, 49 J. OF THE AM. ACAD. OF CHILD & ADOLESCENT PSYCHIATRY 583 (June 2010).  The latter of these studies concluded that "more effective and safer treatments are needed . . . ." *Id*. at 593.

48.     Further, Clozaril, which appears to be the most effective second-generation antipsychotic medication, can cause agranulocytosis, a potentially fatal blood disorder in which the drug triggers a sudden severe deficiency in the number of white blood cells.[6]  For this reason, administration of Clozaril requires frequent blood testing and monitoring, and the drug is typically used as a treatment of last resort.

49.     Additionally, Defendant Department of Human Services' psychopharmacology guidelines acknowledge that a survey of patients in long-term treatment with various antipsychotic drugs found "high prevalence rates for parkinsonism, akathisia, and tardive dyskinesia, or T.D.," and that "a comparison of such prevalence rates with those of past decades suggests that these problems persist, despite the advent of newer [drugs]…." *New Jersey Division of Mental Health Services Psychopharmacological Practice Guidelines for the Treatment of Schizophrenia* (2005), at 75.  Moreover, Department of Human Services Division of Mental Health Services Administrative Bulletin 3:35 ("Prescribing Psychotropic Medication in State Psychiatric Hospitals," January 28, 2010)[7] (attached hereto as Exhibit A) states that:

> use of multiple psychotropic medications increases the risk of adverse drug
> effects, drug-drug interactions and medication errors, and evidence suggests that
> such complex regimens are unlikely to improve outcomes, even in challenging
> patients.  Such medication regimens are also costly, time-consuming for nurses to

---

[6]     *See* http://www.clozaril.com/info/about/side_effects.jsp.

[7]     Available at http://www.state.nj.us/humanservices/dmhs/info/notices/adminbulletins/3_35_rev_jan28_2010.pdf.

administer in the hospital, difficult for patients to understand, and hard for them to adhere to or maintain in the community.

50.     In sum, the severe and potentially life-threatening side effects of psychotropic medications cause many patients to either discontinue their medication or to be unable to retain employment in the community, which consigns them to the vicious cycle of repeated psychiatric hospitalization.  Given the continued pervasiveness of severe side effects from antipsychotic drugs, many patients want to be — and should be — involved in decisions regarding their treatment, and have a rational basis for rejecting such treatment.

**III.     The Right of Psychiatric Patients to Refuse Medication**

51.     Two decades ago, recognizing that the right to refuse unwanted medical treatment has deep roots in the American justice system, the United States Supreme Court held that "[t]he forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty."  *Washington v. Harper*, 494 U.S. 210, 229 (1990).  An individual's right to refuse treatment, therefore, can be overridden only in emergencies or when a court determines that person to be incompetent to make medical decisions.

52.     Today, the right of psychiatric patients to refuse the involuntary administration of psychotropic medication is firmly grounded in the United States Constitution, federal statutes, and New Jersey's Constitution, statutes and regulations.  Sadly, New Jersey hospital administrators have done little to ensure that these rights have any practical meaning for persons confined to psychiatric institutions within the State.

**A.     Federal Law Basis for the Right to Refuse Unwanted Medication**

53.     Over the last three decades, there has been an overwhelming trend across the United States, in both federal and state courts and legislatures, towards respecting the right of

individuals to refuse unwanted psychotropic medication and providing due process protections for the enforcement of this right.

54.     Almost thirty years ago, in *Mills v. Rogers*, 457 U.S. 291, 299 (1982), the Supreme Court recognized that the federal Constitution recognizes a liberty interest in avoiding the unwanted administration of antipsychotic drugs.  Much more recently, a court in this District ruled that the right to refuse unwanted medication is grounded in the individual's right to be free from bodily intrusion.  *Brandt v. Monte*, 626 F. Supp.2d 469, 486 (D.N.J. 2009) (citing *Rochin v. California*, 342 U.S. 165, 172-74 (1952)).  The same court ruled that the right to refuse unwanted medication is further grounded in the individual's right to autonomy and to exercise control over her mental faculties.  *Brandt*, 626 F. Supp.2d at 486 (citing *Lawrence v. Texas*, 539 U.S. 558, 562 (2003) ("Liberty presumes an autonomy of self that includes freedom of thought....")).  Moreover, the Supreme Court has observed that psychotropic drugs are "mind altering," *Mills*, 457 U.S. at 293 n.1, and "alter the chemical balance in a patient's brain, leading to changes . . . in his or her cognitive processes."  *Harper*, 494 U.S. at 229.  *See also Scott v. Plante*, 532 F.2d 939, 946 (3d Cir. 1976) ("It is sufficient to recognize that the involuntary administration of drugs which affect mental processes, if it occurred, could amount, under an appropriate set of facts, to an interference with [a person's] rights under the first amendment.").

### 1.     The *Rennie* Decisions

55.     In the *Rennie v. Klein* case, filed in this District in 1977, patients in New Jersey psychiatric hospitals, including John Rennie, a former pilot and flight instructor, sued to block the State from forcefully drugging them.  The patients were represented by lawyers from the New Jersey Department of the Public Advocate.  District Court Judge Brotman recognized the constitutional right of the patients to refuse treatment, and found that a regulation substantially similar to the Three-Step Process used today in New Jersey insufficiently protected patients'

substantive constitutional rights.  Consequently, Judge Brotman issued an order requiring State hospitals to hold hearings to determine whether patients may be medicated against their will, to provide a lay "patient advocate" to represent patients at hearings, and to retain independent psychiatrists to make the ultimate determination at those hearings.  *Rennie v. Klein*, 476 F. Supp. 1294, 1313 (D.N.J. 1979).

56.    Subsequently, over the course of two years in the early 1980s, the State of New Jersey conducted 105 administrative hearings led by independent decision-makers for psychiatric patients who refused medication; the total cost of these hearings was approximately $10,000. *See* Motion for Leave to File and Brief for the N.J. Dep't of the Public Advocate, Division of Mental Health Advocacy as Amicus Curiae in Support of Respondents at 42, *Mills v. Rogers*, 457 U.S. 291 (1982) (No. 80-1417).  At that time, the New Jersey Department of the Public Advocate concluded that "a due process system works effectively, is cost-efficient, promotes the doctor-patient relationship, and properly protects patients' rights."  *Id*. at 15-16.

57.    In reviewing Judge Brotman's decision, the Third Circuit ultimately held that involuntarily committed mentally ill patients have a constitutional right to refuse administration of antipsychotic drugs.  The court also held that the right to refuse medication administered on a non-emergency basis can be overridden only in two very limited circumstances:  when an individual presents a danger to herself or others, or when she is incapable of making treatment decisions.  The Third Circuit concluded, however, that so long as the decision to administer such drugs against a patient's will is based on accepted professional judgment, hearings before an independent decision-maker are not constitutionally required.  Consequently, according to the court, the Three-Step Process, which merely requires review and approval by hospital staff, satisfies due process requirements, even though it does not provide for hearings.

18

58.     Importantly, the court noted that if, after a reasonable time, New Jersey's procedures were not working, the court could explore other methods to guarantee patients' constitutional rights.   *Rennie v. Klein*, 653 F.2d 836, 851 (3d Cir. 1981) (en banc), *aff'd following remand*, *Rennie v. Klein*, 720 F.2d 266 (3d Cir. 1983) (en banc).

59.     The facts before the Court today are similar to those that were before Judge Brotman thirty years ago, and it is clear that the State of New Jersey has not learned anything from the past.  Patients in New Jersey psychiatric hospitals are subject to egregious abuse today, just as they were three decades ago.   Although the law has changed and conditions have improved for patients in other states, New Jersey remains frozen in time.   In 1979, Judge Brotman found that administrators and psychiatrists at every level of New Jersey State psychiatric hospitals ignored and subverted patients' rights to refuse medication.  *See Rennie,* 476 F. Supp. at 1303, 1305.  As will be shown below, *see* Sections IV-VI, nothing has changed over the last three decades — administrators and psychiatrists in the same New Jersey State psychiatric hospitals continue to violate patients' rights.

### 2.     The Development of Federal Law After *Rennie*

60.     In a trilogy of cases decided after *Rennie* — *Washington v. Harper*, 494 U.S. 210 (1990); *Riggins v. Nevada*, 504 U.S. 127 (1992), and *Sell v. United States*, 539 U.S. 166 (2003) — the Supreme Court held that the right to refuse medication is guaranteed by the Fourteenth Amendment's Due Process Clause.

61.     Twenty years ago, in *Harper*, which involved an individual serving a prison sentence for robbery, the Supreme Court held that a prisoner with mental illness cannot be treated against his will based on the mere "professional judgment" of a physician.   Rather, medication can only be given to a prisoner against his will if he "suffers from a mental disorder and is gravely disabled or poses a likelihood of serious harm to himself or others."  *Harper*, 494

19

U.S. at 215.   The Court ruled that, at a minimum, due process requires there to be some independence between the decision-maker and the proponent of the medication.[8]

62.   The *Harper* Court upheld a prison regulation providing that a decision to medicate a prison inmate involuntarily should be made by a hearing committee composed of a psychiatrist, a psychologist, and the associate superintendent of the prison.   Under the procedure, none of the committee members could be involved, at the time of the hearing, in the inmate's treatment or diagnosis; the committee's decision was subject to review by the prison superintendent; and the inmate was entitled to seek judicial review of the decision in a state court.   Further, the inmate was entitled to the assistance of a lay advisor who had not been involved in his case and who understood the psychiatric issues involved.   The *Harper* Court concluded that involuntary medication of prisoners was justified by "legitimate penological interests," namely, the State's need to maintain prison safety and security.   Notably, even though the Supreme Court recognized the State's legitimate interest in maintaining prison safety, it was not willing to sacrifice an individual's right to be free from unnecessary and unwanted medication.

---

[8]   In 1989, Chief Justice Roberts, then in private practice, co-authored an amicus brief for the American Psychological Association in support of prisoner Harper, eloquently arguing that individuals are constitutionally entitled to have forcible medication decisions reviewed by an independent decision-maker:

> [A]ntipsychotic drugs have both an inherent potential for abuse and an actual history of indiscriminate use by the psychiatric profession.   In this respect they are similar to psychosurgery and electroshock therapy, highly invasive treatments which psychiatrists embraced enthusiastically and used indiscriminately — until their tragic effects became publicized and their use was curtailed by legislative, judicial, and scientific pressure.   Because many psychiatrists will not heed the warnings in the scientific literature as to the dangers and misuse of neuroleptic drugs, independent and unbiased decision-makers should decide whether orders for forced medication are justified.

Amicus Curiae Brief of the American Psychological Association in Support of Respondent at 13-14, *Washington v. Harper*, 494 U.S. 210 (1990) (No. 88-599).

63.     If individuals with mental illness confined to prisons — which are typically designed to punish — are guaranteed procedural rights before being involuntarily drugged, then individuals with mental illness involuntarily committed to psychiatric hospitals — which are supposed to be therapeutic, not punitive — are entitled to the same if not more dignified treatment and greater procedural protections than prisoners.

64.     Following *Harper*, the Supreme Court confronted whether the forced administration of antipsychotic drugs during trial violated a murder defendant's due process rights.  In *Riggins*, the Supreme Court held that the administration of unwanted antipsychotic medication infringes a liberty interest and may not be imposed absent a compelling governmental interest and the use of the ***least intrusive means*** of accomplishing it.  The Court concluded that non-convicts in the criminal process have more rights than prisoners and required the State to show that treatment with antipsychotic medication was medically appropriate and, considering less intrusive alternatives, essential for the individual's safety or the safety of others, or for a fair trial.   In his concurrence, Justice Kennedy (the author of the majority opinion in *Harper*) stated that he would require an "extraordinary" showing by the State before allowing the involuntary administration of antipsychotic drugs for purposes of rendering an accused competent for trial, and "express[ed] doubt that the showing can be made in most cases, given our present understanding of the properties of these drugs."  *Riggins*, 504 U.S. at 139.

65.     In 2003, the Supreme Court decided *Sell*, in which the question was whether an individual could be forcibly medicated to render him competent to stand trial.   There, the Supreme Court held that the Government can involuntarily administer psychotropic drugs to a criminal defendant charged with a serious crime in order to render that defendant competent to stand trial ***only*** if the court determines that treatment is medically appropriate; is substantially

unlikely to have side effects that may undermine the fairness of the trial; and, taking account of less intrusive alternatives, is necessary significantly to further important governmental interests. Crucially, the *Sell* decision requires due process and a judicial hearing — more than required in *Harper* — **before** the administration of medication, in order for the right to refuse such medication to have any practical meaning.

66.     The *Harper*, *Riggins* and *Sell* cases make it clear that (i) a qualified right to refuse medication is rooted in the United States Constitution; (ii) the pervasiveness of side effects is a key factor in the determination of the scope of the right; (iii) the state bears a considerable burden in medicating a patient over objection; and (iv) medical authorities must consider lesser-intrusive alternatives before involuntarily administering medication.[9]

67.     To the extent that *Harper*, *Riggins* and *Sell* involved inmates in prisons or individuals facing criminal trial, it follows that individuals in psychiatric hospitals with mental illness must have equal or greater rights, since psychiatric hospitals are by definition designed to treat, not punish.  *See Rennie*, 653 F.2d at 846 ("The Constitution is at least as viable behind the walls of a psychiatric hospital as in a prison.").  In fact, "[c]ivilly committed patients may have a *greater* interest in avoiding the unwanted administration of antipsychotic drugs than criminal defendants, since civilly committed patients have not been found guilty of committing a crime."

---

[9]     The Americans with Disabilities Act (the "ADA") reinforces the State's obligation to provide less restrictive treatment alternatives.  Under the ADA, the State of New Jersey must provide services to qualified patients with disabilities in the most integrated setting appropriate to their needs.  ADA, 42 U.S.C. § 12132 (1990) ("[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.").  Additionally, in *Olmstead v. L.C.*, 527 U.S. 581 (1999), the Supreme Court found a limited right to community treatment under the ADA, pursuant to which states are required to explore less restrictive treatments.  *See also Helen L. v. DiDario*, 46 F.3d 325, 332 (3d Cir. 1995) (state violated ADA by requiring that individual receive needed care services in nursing home rather than through attendant care program in her own home).

*Brandt*, 626 F. Supp.2d at 486 n. 19.   *See also Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982) ("Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.").   New Jersey, however, has failed to grant equal or greater rights to individuals with mental illness who are not incarcerated in penal institutions.   In fact, today in New Jersey psychiatric patients have *less* rights when it comes to refusing medication than persons with mental illness incarcerated in New Jersey's prisons and jails.

68.     Further, regulations issued by the federal Centers for Medicare & Medicaid Services, which apply to Defendants, provide that a patient in a psychiatric hospital has the right to be "informed of his or her health status, [to be] involved in care planning and treatment, and [to be] able to request or refuse treatment."  42 C.F.R. § 482.13(b)(2) (2006).

## B.     New Jersey Law Basis for the Right to Refuse Unwanted Medication

69.     In addition to being out of touch with federal law, New Jersey's current practices are out of touch with New Jersey's own constitution and laws.  Forced medication without due process violates Article I, paragraph 1 of the New Jersey Constitution, which grants fundamental and "unalienable" rights of "liberty" and "safety" to all people.  N.J. Const. art. I, § 1.

70.     Forced medication without due process also violates the guarantee of New Jersey law that "[e]very individual who is mentally ill shall be entitled to fundamental civil rights . . . ."  N.J. STAT. ANN. § 30:4-24.1 (1975).  Every patient in treatment in psychiatric hospitals in the state is entitled to all rights set forth in the New Jersey Patients' Bill of Rights.  N.J. STAT. ANN. § 30:4-24.2 (1975).  This law explicitly provides that a patient may not be presumed to be incompetent because she has been examined or treated for mental illness, regardless of whether such evaluation or treatment was voluntarily or involuntarily received.   Additionally, the Patients' Bill of Rights provides that:

23

(a)  patients have the right to be free from unnecessary or excessive medication;

(b)  no medication shall be administered unless at the written order of a physician;

(c)  the attending physician shall review the drug regimen of each patient under his care at least weekly;

(d)  all prescriptions shall be written with a termination date not exceeding 30 days;

(e)  medication shall not be used as punishment, for the convenience of staff, as a substitute for a treatment program, or in quantities that interfere with the patient's treatment program; and

(f)  voluntarily committed patients shall have the right to refuse medication.

71.    Moreover, forced medication without due process violates the requirements of the Patients' Bill of Rights that patients have the right to the least restrictive conditions necessary to achieve the purposes of treatment, the right to privacy and dignity, the right to be free from physical restraint and isolation (except for emergency situations), and the right to be free from corporal punishment.  Although New Jersey law affords patients the right to enforce any of these rights by civil action or other remedies otherwise available by common law or statute, patients are effectively unable to assert these remedies, as will be shown below in Section IV.A.  All of these rights, therefore, are illusory, as far as Plaintiff's constituents are concerned.

72.    Similarly, forced medication without due process violates regulations promulgated by Defendant DHSS that guarantee each New Jersey hospital patient the right to give informed, written consent prior to the start of nonemergency treatment, only after a physician has explained — in terms that the patient understands — specific details about the recommended procedure or treatment, the risks involved, the possible duration of incapacitation, and any reasonable medical alternatives for care and treatment.  DHSS regulations also state that if a patient is incapable of giving informed, written consent, consent must be sought from the patient's next of kin or guardian or through an advance directive, to the extent authorized by law,

and that patients have a right to refuse medication and treatment to the extent permitted by law and to be informed of the medical consequences of refusal.  N.J. ADMIN. CODE  8:43G-4.1 (2005).

73.     These New Jersey laws and regulations give rise to liberty interests protected by the Due Process Clause of the Fourteenth Amendment, so that patients may insure that these state-created rights are not arbitrarily abrogated.  *See Vitek v. Jones*, 445 U.S. 480, 488-89 (1980) (involuntary transfer of a prisoner to a mental hospital pursuant to state law implicates a liberty interest protected by the Fourteenth Amendment's Due Process Clause).

74.     New Jersey's failure to respect the rights of psychiatric patients is all the more disturbing due to the substantial due process protections the State provides to other institutionalized persons, in particular individuals with developmental disabilities and prisoners. Persons with developmental disabilities residing in facilities operated by Defendant Department of Human Services are provided a judicial hearing and a court-appointed guardian before they can be involuntarily medicated with psychotropic drugs.  *See* N.J. Department of Human Services, Division of Developmental Disabilities ("DDD") Division Circulars Nos. 21[10] and 41[11]; N.J. ADMIN. CODE 10:43-3.1(a) (2008); N.J. ADMIN. CODE 10:43-4.1 (2008).

75.     Further, as mandated by *Harper*, an inmate in a New Jersey prison who has a mental illness is entitled to a hearing before he can be involuntarily medicated with psychotropic drugs.  Significantly, the hearing is conducted by a panel of three professionals, none of whom may be currently involved in the inmate's treatment or diagnosis, and the prisoner may not be

---

[10]    Available at http://www.state.nj.us/humanservices/ddd/documents/ddd%20web%20current/CIRCULARS/DC21.pdf.

[11]    Available at http://www.state.nj.us/humanservices/ddd/documents/ddd%20web%20current/CIRCULARS/DC41.pdf.

medicated until the panel reaches a decision.  The prisoner is provided advance notice of the hearing and has the right to be present at the hearing, to have the assistance of an advisor, to call and confront witnesses and present evidence, and to appeal the panel's decision.  *See* N.J. ADMIN. CODE 10A:16-11.1 *et. seq.* (2007).

76.     Plaintiff's constituents, unlike persons with developmental disabilities and prison inmates with mental illness, do not receive notice, assistance and the right to meaningfully participate in a hearing before they are forcibly drugged.

### C.     International Law Basis for the Right to Refuse Unwanted Medication

77.     New Jersey's failures are underscored by the fact that an expansion of the rights of people with disabilities has taken place not only in the United States, but also internationally. In May 2008, many countries ratified the Convention on the Rights of People with Disabilities (the "CRPD").[12]  One of the purposes of the CRPD is "to promote, protect and ensure the full and equal enjoyment of all human rights and fundamental freedoms by all persons with disabilities, and to promote respect for their inherent dignity."  (CRPD, Art. 1.)  Among the many rights of people with disabilities protected by the CRPD are the rights to equal recognition under the law (Art. 12), access to justice (Art. 13), and to live in the community, with choices equal to others.  (Art. 19.)  The United States signed the CRPD in 2009, and under the Vienna Convention on the Law of Treaties, once a nation signs a Convention, it is "obliged to refrain from acts which would defeat the object and purpose" of that Convention.  Vienna Convention on the Law of Treaties art. 18, May 23, 1969, 1155 U.N.T.S. 331.[13]  Although the United States

---

[12]   *See* http://www.un.org/disabilities/documents/convention/convoptprot-e.pdf.

[13]   The U.S. has signed but not ratified the Vienna Convention on the Law of Treaties, but it regards this convention as "the authoritative guide to current treaty law and practice."  *See* Secretary of State Rogers' Report to the President, Oct. 18, 1971, 65 DEP'T ST. BULL. 684, 685 (1971).

has not yet ratified the CRPD, the U.S. Supreme Court has made it clear that "the opinion of the world community, while not controlling [the Court's] outcome, does provide respected and significant confirmation for [its] own conclusions."  *Roper v. Simmons*, 543 U.S. 551, 578 (2005).

## IV.  The Three-Step Process Provides No Meaningful Due Process Protections and is Therefore Unconstitutional

78.    Today, New Jersey purports to protect the right to refuse unwanted medication through the Three-Step Process.  As discussed above, the Three-Step Process is a peer review procedure that was approved in the Third Circuit's *Rennie* decision, rendered more than a quarter-century ago.  Over substantial dissent, the Third Circuit in 1983 held that, on the facts before it, compliance with the Three-Step Process, assuming the exercise of professional judgment, protected a patient's federal substantive and procedural due process rights.  *See Rennie*, 720 F.2d at 269-70.  The Three-Step Process is now set forth in Department of Human Services Administrative Bulletin 5:04 ("The Administration of Psychotropic Medication to Adult Voluntary and Involuntary Patients," September 15, 1983) ("A.B. 5:04")[14] (attached hereto as Exhibit B), which includes emergency and non-emergency procedures for forcible medication.[15] Whatever the merits were of *Rennie* at the time it was decided, the Three-Step Process today fails to provide basic due process protections and is wholly unconstitutional.

---

[14]    Available at http://www.state.nj.us/humanservices/dmhs/info/notices/adminbulletins/5_04.pdf.

[15]    Just last year, New Jersey's emergency involuntary medication procedure — which is also regulated by A.B. 5:04 — was the subject of litigation in this District brought by a patient who had been hospitalized at Ancora. In *Brandt v. Monte*, the Court ordered a trial on plaintiff's claims that his constitutional rights had been violated because hospital staff deviated from standards of professional judgment and failed to provide an independent and impartial review in administering medication over his objection.  *Brandt*, 626 F. Supp.2d at 475.

79.     New Jersey's forced medication practices must be evaluated in light of the Supreme Court's decision in *Youngberg v. Romeo*, 457 U.S. 307 (1982).  In *Youngberg*, the Court held, in the context of an action for money damages, that the Due Process clause of the Fourteenth Amendment prohibits the State from restraining patients except and to the extent professional judgment deems such restraint necessary to assure patients' safety.  *Id*. at 324.  Treatment is not adequate if it substantially departs from generally accepted professional judgment, practice, or standards.  *Id.* at 320-23.  States are thus compelled by the Constitution to ensure that patients are free from hazardous drugs that are "not shown to be necessary, used in excessive dosages, or used in the absence of appropriate monitoring for adverse effects." *Thomas S. v. Flaherty*, 699 F. Supp. 1178, 1200 (W.D.N.C. 1988), *aff'd*, 902 F.2d 250 (4th Cir. 1990).  Excessive use of chemical restraints, excessive dosages of medication, and unjustified use of polypharmacy constitute substantial departures from professional standards.  *See Thomas S.*, 699 F. Supp. at 1188-89.  Moreover, "restraint should only be used as a last resort."  *Id.*; *Davis v. Hubbard*, 506 F. Supp. 915, 943 (W.D. Ohio 1980).

80.     Significantly, the *Rennie* litigation preceded the U.S. Supreme Court's decisions in *Harper, Riggins* and *Sell* — all of which rejected peer review procedures similar to the Three-Step Process.  Because the Three-Step Process fails to comport with contemporary constitutional requirements, the Third Circuit would likely reject the Three-Step Process today.

81.     Under New Jersey's Three-Step Process, if a patient objects to taking prescribed psychotropic medication, a psychiatrist can initiate the Three-Step Process and force the patient to take the medication without having to show that the patient is a danger to herself or others. The psychiatrist must simply believe that either (1) the patient is incapable, without medication, of participating in any treatment plan available at the hospital that will give her a realistic

opportunity of improving his/her condition; or (2) a treatment plan which includes medication would probably improve the patient's condition within a significantly shorter time period, *or* there is a significant possibility that the patient will harm herself or others before improvement of her condition is realized, if medication is not administered.

82.     As inadequate as it is, the Three-Step Process is not even applied in psychiatric hospitals that are licensed by Defendant DHSS but not administered by the Department of Human Services.[16]  In other words, county and private psychiatric facilities do not follow the Three-Step Process.  For example, at Monmouth Medical Center, a psychiatric patient may be forcibly medicated simply upon the authorization of two psychiatrists.  *See* Monmouth Medical Center Policy #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, "Administering of Psychotropic Medication Overriding a Patient's Right to Refuse" (August 2008) (attached hereto as Exhibit C).[17]  Therefore, patients in many psychiatric hospitals, including private hospitals, lack even the illusion of due process afforded by the Three-Step Process.  They can be, and are, forcibly drugged without any due process whatsoever.

### A.     New Jersey Institutions Fail to Comply with the Three-Step Process

83.     New Jersey's Three-Step Process is an abject failure and has been for many years. Non-compliance with its written requirements is the norm and record-keeping is shoddy at best. Moreover, even if the State were to comply with the provisions of A.B. 5:04, it is clear that the

---

[16]  This section explains how the Three-Step Process applied in State psychiatric hospitals violates patients' constitutional rights.  To the extent that county and private hospitals do not even apply the Three-Step Process or apply a lesser version of same, *a fortiori*, these hospitals' involuntary medication procedures also violate patients' constitutional rights.

[17]  Under this provision, medication can be administered over objection for a maximum of seven days, after which new authorization must be sought from two psychiatrists.

Three-Step Process does not meet contemporary standards of due process or equal protection and is emblematic of Defendants' failure to involve Plaintiff's constituents in their own recovery.

84.     Significantly, few patients are even made aware of the existence of the Three-Step Process or the so-called *Rennie* Advocate, a lay patient advisor position created by New Jersey during the *Rennie* litigation.  As will be explained below, the *Rennie* Advocates are ineffective, and those patients who are made aware of the Three-Step Process are not allowed to participate actively in it, which makes it a meaningless exercise in paper shuffling.

85.     The Three-Step Process is a mere rubber stamp and it may take as little as a few hours for hospital staff to sign the Three-Step Form, which allows hospital staff to involuntarily inject a patient with psychotropic medication.  *See Brandt*, 626 F. Supp.2d at 473 ("That morning, [Dr.] Monte initiated the [T]hree-[S]tep . . . Procedure for medicating a patient involuntarily.  By noon, this procedure had been completed.").[18]

86.     The Three-Step Process merely requires hospital staff to complete three informal steps before involuntarily administering psychotropic medication.  In the ***first step***, if a patient refuses psychotropic medication, the treating psychiatrist ***must*** meet with the patient to discuss, and attempt to respond to, the patient's concerns about the medication.  The psychiatrist can suggest that the patient discuss the matter with a person of her own choosing, such as a relative

---

[18]   The New Jersey Department of the Public Advocate concluded two decades ago that the Three-Step Process does not protect patients' rights, arguing that

> The New Jersey experience shows that a refusing patient is 24 times more likely to achieve a discontinuation or reduction of medication when there is external review . . . than he is when the review is solely internal.  Mandatory external review has provided meaningful review with the real potential that objecting patients would be afforded significant relief.  Conversely, internal review lacks that potential and constitutes a "rubber stamp" process disguised as independent review, thus denying due process of law.

Brief for the New Jersey Department of the Public Advocate as Amicus Curiae in Support of Respondent at 51-52, *Washington v. Harper*, 494 U.S. 210 (1990) (No. 88-599).

or friend, and **must** advise the patient that a *Rennie* Advocate is available to provide assistance to the patient.  If the patient still refuses medication, the psychiatrist must complete the first section of the Three-Step Form and proceed to the second step.

87.    Defendants' failure to comply with even the rudimentary dictates of the Three-Step Process is shown by failures in documentation, which abound at each step.  The failure to follow the first step of the Three-Step Process is evidenced by the fact that the Three-Step Form used in State hospitals to document the steps does not even include a box to indicate that a psychiatrist has personally examined a patient and discussed medication with her.  Also, there is no requirement that the psychiatrist specify precise medications or dosages on the form.  In practice, psychiatrists often simply write in a laundry list of psychotropic medications.

88.    In the **second step**, if the patient still refuses to take the medication and the psychiatrist believes that medication is a necessary part of the patient's treatment plan, the psychiatrist **must** advise the patient that the matter will be discussed at a meeting of the patient's treatment team, and invite the patient to attend that meeting.  The treatment team must meet to discuss the psychiatrist's determinations and recommendations and the patient's response.  If the patient is present, the team must attempt to formulate a treatment plan that is acceptable to the patient and the team.  The patient may agree to take medication unconditionally or under certain conditions that are acceptable to the psychiatrist.  If the patient is not present, the team and the psychiatrist must discuss the psychiatrist's recommendations and the patient's response, and the conclusions must be documented in the patient's chart.  If the patient still refuses, the psychiatrist must complete the second section of the Three-Step Form, and proceed to the third step.

89.    Defendants' failure to follow the second step is shown by the fact that patients are infrequently given the option of attending the treatment team meeting.  Even the *Rennie*

Advocates seldom attend.  Moreover, many Three-Step Forms lack any documentation of the completion of this step and bear only the program coordinator's signature, not the signatures of the treatment team, as required.  Further, the Three-Step Form facilitates non-compliance with A.B. 5:04 because it does not require an explanation for the patient's non-attendance at the treatment team meeting; in fact, on most patients' forms, there is no indication whether the patient attended the treatment team meeting at all.

90.     In the ***third step***, if the patient still refuses to take prescribed medication and the psychiatrist still believes that the medication is a necessary part of the patient's treatment plan, the psychiatrist turns to his supervisor, the facility Medical Director, who ***must*** personally examine the patient and review the patient's chart.  If the Medical Director agrees with the psychiatrist's treatment plan, he must complete the third section of the Three-Step Form and only then can the patient be involuntarily medicated — which frequently occurs by intramuscular injection.

91.     The State's failure to follow the third step is demonstrated by the fact that Medical Directors rarely if ever overturn treating psychiatrists' decisions.  In fact, Medical Directors often do not even perform the third step themselves but rather delegate this function to a lower ranking staff member, making the third step a mere pretext or sham.  Moreover, the Three-Step Form does not require the Medical Director to specify whether he has met with the patient or provide the patient's reasons for refusing medication.

92.     Additionally, the State fails to comply with the follow-up requirements of the Three-Step Process.  As the Third Circuit noted in *Rennie*, 653 F.2d at 849, a key safeguard for patients' rights is the requirement that the Medical Director make a weekly review of the

treatment program of each patient who is being drugged against his will to determine whether forced drugging is still necessary.  The State has wantonly abandoned this due process safeguard.

93.     New Jersey's State hospitals are filled with patients on refusing status who do not have a current psychiatrist's *monthly* progress note — much less the required weekly note — legitimizing the continued use of involuntary medications.  Often, psychiatrists do not even sign the perfunctory monthly "Medication Review Forms" that are filled out by the *Rennie* Advocates.  Moreover, there is no expiration date to the Three-Step Forms.  Once a decision is made that a patient should be medicated involuntarily, there is no further formal review and involuntary medication can continue for the duration of the patient's hospitalization, which lasts for years in the case of many patients in New Jersey State hospitals.

94.     Further, many patients do not even undergo the Three-Step Process because they are coerced into not objecting to medication.  For example, State hospital staff have used the emergency version of the Three-Step Process — which may be invoked only in crisis situations — to coerce patients to agree to take psychotropic medication on a non-emergency basis.  In *Brandt*, the Court found that "a number of Ancora employees testified in depositions that the first step in attempting to medicate a patient who refuses to grant consent is to issue an Emergency Certificate as a prerequisite to the Non-Emergency Procedure."  *See Brandt*, 626 F. Supp.2d at 479.  Tellingly, a psychiatrist at Ancora testified that she engaged in this coercive practice because it facilitated attainment of patient consent.  *Id*.  Even a psychiatrist hired by the State as an expert witness in the *Brandt* litigation admitted that the State's practices were coercive.  *Id*.  Additionally, patients are often threatened by hospital staff with painful and degrading intramuscular injections if they refuse to take prescribed psychotropic medication by mouth.  Those patients who are assertive enough to refuse medication and consequently undergo the

Three-Step Process often feel that the treatment team meetings are little more than an opportunity for hospital employees to bully them into agreeing to take medication.

95.     A patient has very limited recourse after the Medical Director decides that the patient can be involuntarily medicated.  In theory, the patient can file a petition in the Superior Court under N.J. Stat. Ann. 30:4-27.11c(d) (1991).  The reality, however, is that appeals of medication orders are seldom, if ever, filed because patients lack counsel, and unlike prisoners, they lack access to a law library or other means of access to the courts.  Moreover, the burden should be on the State to justify forced medication at a fair hearing.  The State should not be allowed to shift the burden to the patient to show why the State should not be allowed take away her constitutional rights.

96.     Ironically, as discussed in more detail below, despite the fact that even perfunctory completion of the Three-Step Form assumes that a patient is competent to make health care decisions, the Three-Step Process endorses the stripping away of patients' rights to make choices about psychotropic medication and their health care.

**B.     *Rennie* Advocates Provide Little Assistance to Patients and Lack Independence**

97.     The failure of the Three-Step Process to protect patients' rights is underscored by the utter ineffectiveness of those staff members who are supposed to advocate for patients. Pursuant to A.B. 5:04, each psychiatric institution must have a *Rennie* Advocate, who "shall be engaged in assisting the patients with respect to medication issues."  As initially conceived, *Rennie* Advocates were supposed to be attorneys, psychologists, social workers, registered nurses, and paralegals, or have any equivalent experience. *Rennie*, 476 F. Supp. at 1313.  The State is required to provide *Rennie* Advocates with training in the effects of psychotropic medication and the principles of legal advocacy, with supervision by an attorney and psychiatrist

in the Office of the Commissioner of the Department of Human Services. *Id.* Crucially, *Rennie* Advocates must be independent from the hospital bureaucracy. *Id.* at 1311. Today, however, it is unclear what if any required experience, training or supervision *Rennie* Advocates are given, and they completely lack independence from the hospital bureaucracy. For example, at Ancora, the *Rennie* Advocate reports to the hospital's Director of Quality Improvement, who reports to the hospital's Chief Executive Officer.

98.   Moreover, the Three-Step Process does not require that the *Rennie* Advocate follow the expressed preference of the patient, or assist the patient in asserting her right to refuse medication. On the contrary, only after the Three-Step Process is completed for a particular patient is the *Rennie* Advocate even required to be notified that a patient will be involuntarily medicated. At that stage, the *Rennie* Advocate's sole function is to "review" the patient's Three-Step Form and complete a Medication Review Form.

99.   Further, because the *Rennie* Advocates are hospital employees, they lack independence and are often viewed by patients as an extension of the treatment team and not as independent advocates for patients. Many patients do not even learn of the existence of *Rennie* Advocates because the Advocates fail to notify patients about the Three-Step Process. Often, those patients lucky enough to learn about the *Rennie* Advocates never actually meet them. Even when a patient is fortunate to find a *Rennie* Advocate, little advocacy or assistance is provided because the *Rennie* Advocates most often side with the treatment team and almost never request independent psychiatric reviews. In many situations, therefore, the *Rennie* Advocate is made to function as a clerk, filing paperwork but not providing any advocacy or comfort to patients.

100.     In both a stunning breach of the terms and spirit of A.B. 5:04, as well as tacit admission that the *Rennie* Advocate is a completely ineffectual position, Hagedorn Psychiatric Hospital has not even had a *Rennie* Advocate for the last two years.

### C.     Independent Reviews Are Almost Never Requested or Performed

101.     The striking inadequacy of the Three-Step Process is further illustrated by the almost complete lack of independent reviews of involuntary medication decisions.  On paper, the Medical Director, the *Rennie* Advocate, or another staff member — but not the patient — may request an independent psychiatric review of a patient's need for medication, but the patient may be medicated while any such independent review is pending.  If a request is made for an independent review, the Medical Director alone decides whether such a review will be performed.

102.     If the Medical Director decides to convene an independent review, the Department of Human Services designates a psychiatrist to examine the patient.  The examiner then decides whether the patient can be involuntarily medicated, and any such authorization is effective for up to 90 days.  A "review" of the examiner's decision may be sought by either the patient or the Medical Director.  The Medical Director can seek review by asserting either that there was a change in the patient's condition or new facts.  The patient, however, can only seek review on the ground that the examiner's decision is not being followed.  Thus, the patient and the *Rennie* Advocate are powerless to challenge the merits or accuracy of the examiner's decision.  Moreover, the Three-Step Process does not specify who performs this "review of the review," or how it is to be conducted.  Indeed, Plaintiff is unaware of a "review of the review" ever occurring.

103.     Curiously, the decision of the independent reviewer to medicate is the only outcome in the Three-Step Process wherein a decision to medicate is time limited; in all other circumstances the decision stands indefinitely, perhaps for years.

104.     During the independent review process initiated by the *Rennie* Advocate, the patient is entitled to have an attorney present "at his/her request and expense."  Given that most of the patients in New Jersey State hospitals are indigent, however, the right to an attorney during the Three-Step Process is purely illusory.  This stands in stark contrast to the law in many states mandating an absolute right to counsel in medication hearings.  *See e.g., Rivers v. Katz*, 67 N.Y.2d 485, 497 (N.Y. 1986); MASS. GEN. LAWS ch. 123 § 5 (2003); VA. CODE ANN. § 37.2-1101 (2009); TEX. HEALTH & SAFETY CODE ANN. § 574.105 (2010); ALASKA STAT. § 47.30.839 (1992).  In fact, the entire independent review process is also illusory because it rarely, if ever, happens.  Not only are *Rennie* Advocates ***not*** required to request independent reviews, they hardly ever do so.  Further, there is no indication that *Rennie* Advocates ever discuss with patients the possibility of independent reviews, and the Three-Step Process does not require such consultations.   Upon information and belief, hospital officials actively discourage *Rennie* Advocates from requesting independent reviews, telling them that there is no money to pay for independent reviews or that no qualified person will conduct a review for the amount of money the hospital is willing to pay.

105.     Experience shows that reviews of forced medication decisions hardly ever occur in New Jersey.  In a sample of approximately 60 patients in State hospitals who underwent the Three-Step Process within a three-month period in 2009-2010, not a single patient had an

independent review.[19]   Moreover, although each State hospital is required to have a *Rennie* Advocate, upon information and belief, one hospital's *Rennie* Advocate has requested and obtained only one independent review in his fourteen years of service.   At Greystone, independent evaluations have been requested for only three patients over the last six years.   At Ancora, upon information and belief, although numerous patients have asked for independent reviews, not a single one has been requested by hospital staff in recent years and there is no list of independent evaluators from which to choose.

106.   Even worse, at Trenton Psychiatric, upon information and belief, the *Rennie* Advocate did not request a single independent review on behalf of any patient in the six-year period from 2004 to 2010.   When an independent review was requested by DRNJ in October 2009 for constituent N.B. at Trenton Psychiatric, Defendant Department of Human Services refused to perform one.   The reason, according to Karen Piren, the assistant to the Medical Director of Department of Human Services' Division of Mental Health Services, was that her office did not feel that an independent review was necessary for N.B. because, according to Ms. Piren, the purpose of such a review is to determine whether the patient needs to be medicated and does not deal with recommendations regarding the specifics of any prescriptions.   Not only was Ms. Piren mistaken about the purpose of the review, but in fact, DRNJ asked for a review of whether medication was needed at all.

---

[19]   The State's failure to conduct independent reviews of involuntary medication decisions — despite the fact that A.B. 5:04 provides for such reviews — parallels the State's disconnection from reality in the *Rennie* litigation. In 1974 and 1978, State officials reported that not a ***single*** case of tardive dyskinesia had been observed at Ancora Psychiatric Hospital.   Angel Castillo, *Mental Patients' Right to Refuse Medication is Contested in Jersey*, N.Y. Times, March 28, 1981.   However, in 1979, as a result of the *Rennie* litigation, the hospital acknowledged in court that tardive dyskinesia had, in fact, affected an estimated 25 to 40 percent of its patients. *Id*.

107.    Moreover, because under the Three-Step Process, any "independent" psychiatrists are chosen solely by the State, even were the State to conduct reviews, they would not be truly independent.  Patients should have the right to choose their own independent examiners.  At a minimum, an independent examiner should be mutually chosen by the institution and the patient (or her counsel).  Significantly, patients in New Jersey are entitled to be examined by a truly independent psychiatrist prior to being civilly committed.  *In re Gannon*, 301 A.2d 493, 494 (Somerset Cty. Ct. 1973) (a commitment hearing "is of little value, if not actually a sham, when the only testimony is that of the certifying psychiatrist").  This right to an independent examiner should apply equally for patients who refuse medication.

**D.    The Notion of "Functional Incompetence" Allows Doctors to Circumvent the Process**

108.    The Three-Step Process assumes that a patient is competent to make decisions about their medical treatment.  Psychiatrists, however, can perform an easy "end-run" around the Three-Step Process by simply concluding that the patient is "functionally incompetent," on the ground that the patient is not capable of giving informed consent.  If the psychiatrist decides that (1) medication is a necessary part of the patient's treatment plan, (2) the patient is unable, because of his/her illness, to give informed consent to the medication, and (3) the patient is not "refusing" the medication, the psychiatrist simply fills out the first part of the Three-Step Form and the patient can be involuntarily injected.  Moreover, the Three-Step Process does not provide for any institutional or judicial review of psychiatrists' determinations of functional incompetence.[20]

---

[20]   It is possible that the functional incompetence provision of A.B. 5:04 was designed to provide for review of the treatment of long-term patients who consent to take medication but are incompetent, to ensure that they are not
(Continued…)

109.    Nowhere else in New Jersey law is the determination of a person's legal competency to consent to treatment left solely to the discretion of the treating physician.  In fact, New Jersey provides court hearings to people who have a variety of medical issues if those persons are at odds with medical providers over treatment and the medical providers question the person's competency to make informed decisions.  For example, New Jersey has provided a court hearing in order to determine the competency of a person with a gangrenous foot who would not consent to an amputation, and whom the medical personnel believed to be incompetent because he would not consent.  *See In the Matter of William Schiller*, 372 A.2d 360, 368 (N.J. Super. Ct. Ch. Div. 1977).  New Jersey also provided a court hearing to a person who was comatose and could not communicate at all.  *See In re Quinlan*, 355 A.2d 647 (N.J. 1976).  Paradoxically, the same psychiatric patient who can be forced to take psychotropic medication under the Three-Step Process would be entitled to counsel and a court hearing if the hospital wished to administer medical treatment, such as dialysis, over objection.

110.    Indeed, informed consent is an essential part of medical care. In New Jersey, "informed consent" is "what the physician should disclose to a reasonable patient in order that the patient might make an informed decision" regarding her treatment.  *Largey v. Rothman*, 540 A.2d 504, 505 (N.J. 1988).  Yet, under the Three-Step Process, a psychiatrist can simply declare a patient functionally incompetent, allowing the State to circumvent the Three-Step Process, rendering it meaningless.  Further, the very notion of "functional incompetence" eviscerates the fundamental presumption — codified under New Jersey law — that psychiatric patients may not

---

overmedicated.  In practice, however, psychiatrists at State hospitals do not appear to use the functional incompetence provision for this purpose.

be assumed to be incompetent to make treatment decisions.  *See* N.J. STAT. ANN. 30:4-24.2(c) (1975).

111.   The Three-Step Process is thus based on the outdated notion that mental illness renders a person incompetent, which has been proven to be clinically inaccurate.  The MacArthur Treatment Competence Study, published in 1995, confirms that mental illness cannot be equated with incompetence, that many individuals with mental illness retain full decision-making capacity, and that even when such illness impairs capacity in one area, it may leave capacity unimpaired in others.   The study measured four criteria of decision-making capacity — communicating a choice, understanding relevant information, appreciating a situation and its consequences, and reasoning about treatment options — and concluded that nearly one half of the schizophrenic subjects and 76% of the depressed subjects performed in the "adequate" range across all decision-making measures, and a significant portion performed at or above the mean for persons without mental illness.  *See* Thomas Grisso & Paul Appelbaum, *The MacArthur Treatment Competence Study III: Abilities of Patients to Consent to Psychiatric and Medical Treatments*, 19 LAW & HUM. BEHAV. 149, 171 (1995).

112.   The authors of the MacArthur study concluded that those who would deny individuals with mental illness equal decision-making rights "no longer can maintain that *all* persons who are in need of hospitalization for mental disorder lack the requisite ability to make decisions regarding their treatment."  *Id*. at 171.  The study demonstrates the need for individualized determinations of competency and shows the falsity of the assumption that mental illness equates with impaired ability to make treatment decisions.

113.   Recent research has confirmed the findings of the MacArthur Competence Study. For example, in an article published in the *New England Journal of Medicine* in 2007, Dr. Paul

Appelbaum, one of the key MacArthur researchers and the past President of both the American Psychiatric Association and of the American Academy of Psychiatry and the Law, noted that the reliability of unstructured judgments of competence by physicians has been poor (in some cases no better than chance), and that if an evaluator believes that a patient is incompetent to make a treatment decision, unless the urgency of the patient's medical condition requires that a substituted decision be sought immediately, efforts should be made to identify the causes of the impairment — which may include the patient's sedation due to psychotropic medication and lack of access to information — and to remedy them. Paul S. Appelbaum, *Assessment of Patients' Competence to Consent to Treatment*, 357 NEW ENG. J. MED. 1834, 1838 (Nov. 1, 2007).

114.    Similarly, a quantitative review of competence studies published in the journal *Schizophrenia Bulletin* in 2006 concluded that impairment in capacity is not a distinguishing feature of schizophrenia, that receiving higher doses of medications may adversely impact cognition, and that in-hospital educational techniques might help improve the capacity of patients. Dilip Jeste, Colin Depp and Barton Palmer, *Magnitude of Impairment in Decisional Capacity in People With Schizophrenia Compared to Normal Subjects: An Overview*, 32 SCHIZOPHRENIA BULL. 121 (Jan. 2006). Thus, over-medication may in fact interfere with patients' ability to participate in their medical treatment.

E.    **New Jersey Institutions Fail to Exercise Professional Judgment in Medication Practices**

115.    Patients' concerns about psychotropic medication have proven to be well founded, not only because of the severe side effects of such medication, but because New Jersey hospitals often fail to exercise professional judgment in medicating patients. After conducting an exhaustive investigation of Ancora Hospital, the United States Department of Justice in August 2009 issued a damning 40-page report (*see* Exhibit D, attached hereto), concluding that:

42

> ***Ancora's psychopharmacology practices also substantially deviate from generally accepted professional standards in several important respects.*** Extensive PRN [as-needed medication] use reflects reactive care and sub-therapeutic treatment of the patient's underlying condition. Although Ancora's pharmacy contractor is supposed to audit high PRN usage, the audit described to us has a retrospective design that is unlikely to provide timely and useful data to psychiatrists to better manage the treatment of these patients. Moreover, in November 2008, a month when several patients experienced continued excessive PRN use, including D.D., who had 92 PRNs, not even this retrospective audit was conducted, and thus, pharmacy failed to provide data about this important indicator that should have been considered in patient care. Another important safeguard in psychopharmacology is the monitoring of adverse drug reactions ("ADRs"). Plans were described to us for improvements in the reporting system to make it less punitive, although these and other proposed changes are not yet evident in facility records. Staff described a system where physicians have electronic access to current information about potential drug interactions at the point of care, that is, on the units, however, we saw no evidence that this safeguard is in place or used by physicians. It also appears that pharmacy does not trend or aggregate data on ADRs and share that information with physicians in order to improve patient care and patient outcomes. In each of these respects, psychopharmacology practices at Ancora substantially deviate from generally accepted professional standards. (Emphasis added.)

Letter from United States Department of Justice to Governor of New Jersey (August 19, 2009), at 22.[21]

116.    Medication errors — which occur all too frequently in New Jersey State psychiatric hospitals — endanger patients' lives. Tragically, in 2007, constituent J.P. died four days after being transferred to Greystone Park Hospital from a medical hospital whose doctors had ordered that Greystone psychiatrists stop the administration of certain antipsychotic drugs, which had caused him to experience Rhabdomyolysis and Parkinsonian tremors. J.P. had previously been sent to the medical hospital from Greystone due to tremors, dehydration and increased creatine phosphokinase levels.

---

[21]    Available at http://www.state.nj.us/humanservices/dmhs/oshm/aph/DoJFindingsLtrAncora_2_19Aug09.pdf.

117.    In 2008, S.D., a patient at Ancora, almost died from Depakote toxicity and a possible reaction to Lithium.  Further, in March 2010, Greystone patient T.B., who had been treated for Attention Deficit Hyperactivity Disorder, was hospitalized in a medical facility for lithium toxicity after being prescribed lithium and several other powerful psychotropic drugs. Indeed, hospital records show that overdoses, adverse reactions to medicines, and incorrect doses of psychotropic drugs have harmed dozens of patients at Ancora alone since 2006.  At Ancora, from 2006 to 2008, there were at least 35 cases in which patients needed additional monitoring for medication mistakes, including the following:[22]

(a)    In February 2006, a patient was mistakenly given Phenobarbital (an anti-convulsant) instead of Klonopin (an anti-anxiety medication).

(b)    In January 2007, a patient needed additional monitoring after drinking another patient's lithium (a drug used to treat bipolar disorder) that was mixed with orange juice.

(c)    In January 2007, a patient received a dose of Oxycontin (a pain medication) at 3:30 p.m. and again 30 minutes later because a nurse did not check to see if the patient had already received a dose.

(d)    In March 2007, orders for a patient were transcribed incorrectly by a nurse. Doses of Haldol (an antipsychotic medication), Ativan (a sedative) and Cogentin (an anti-Parkinson's drug) were missed.

(e)    In May 2007, a patient was given 58 units of insulin even though the patient was not supposed to receive the drug.

(f)    In approximately August 2007, a patient required additional monitoring after the patient was given Clozapine (an antipsychotic drug), instead of Tegretol (an anti-seizure drug).  The pharmacy sent the wrong medicine and the nurse was unfamiliar with the generic names.

(g)    In January 2008, a nurse gave a patient Klonopin instead of Ativan.

---

[22]    These incidents are stunningly similar to the ones reported by Judge Brotman in the *Rennie* litigation more than three decades ago.  *See Rennie*, 476 F. Supp. at 1300-03.

44

(h)     In March 2008, a patient was sent to the emergency room after becoming lethargic.  The patient had received Haldol, Ativan and Benadryl.

(i)     June 2008, a patient was given 2.5 mg of Klonopin instead of the 1 mg dose that had been ordered.

(j)     In August 2008, a patient received 13 doses of another patient's medication.

According to Ellen Lovejoy, a spokeswoman for Defendant Department of Human Services, Ancora's medication error rate was 2.4 percent in 2008, 3 percent in 2007 and 2.2 percent in 2006.[23]  At Ancora, patients' charts are frequently in disarray, and are sometimes mixed with those of other patients, making medication errors more likely.  Moreover, as noted above (*see* Section II), adverse drug reactions are more frequent in patients — like many of those in New Jersey psychiatric hospitals — who are subjected to polypharmacy.[24]

118.     Indeed, since errors are self-reported, it is reasonable to assume that many other errors are not even documented.  This conclusion is supported by a 2003 study published in the journal *Psychiatric Services* that reviewed medical charts and medication error rates for 31 patients hospitalized for two months in a state psychiatric facility.  Benjamin Grasso, et al., *Use of Chart and Record Reviews to Detect Medication Errors in a State Psychiatric Hospital*, 54 PSYCHIATRIC SERVS. 677 (May 2003).   The researchers found that hospital staff greatly underreport drug mistakes, including potentially deadly errors.   In the study, hospital staff reported 9 errors per 1,448 patient days, but researchers actually found a total of 2,194 errors, of

---

[23]  *See* Jean Mikle, *Wrong Pills, Doses Cause Harm: Mixups Leave Patients at Risk*, ASBURY PARK PRESS, Apr. 5, 2009 (available at http://www.app.com/article/20090405/NEWS/90405001/Wrong-pills-doses-cause-harm-Mixups-leave-patients-at-risk).

[24]  Medication errors are made more likely by the fact that in New Jersey State psychiatric hospitals, there are no educational requirements for custodial care positions (staff members who have the most patient contact). "Staffing at State Psychiatric Facilities," New Jersey Department of the Public Advocate, Division of Mental Health Advocacy (available at http://www.state.nj.us/publicadvocate/mental/pdf/HospitalStaffingPol-3-24-09-FINAL.pdf), at 2.  In fact, at Ancora, more than 10% of the custodial direct care staff do not even have a high school diploma.  *Id*. at 4.

which 58 percent had the potential to cause severe harm to patients. The researchers concluded that reported error rates are usually substantially lower than actual rates because of the flaws inherent in self-reporting.

119.    Additionally, New Jersey hospitals sometimes minimize medication errors, concluding that they cause no harm to patients if the mistake does not lead to a serious illness or adverse reaction. At Ancora, for example, a patient missed 58 doses of a pain medication because the medicine was not available. This error was considered by Ancora officials to have caused no harm to the patient under the hospital's reporting standards.

## V.    The Three-Step Process Disempowers and Endangers Plaintiff's Constituents

120.    Decisions about involuntary medication of patients in New Jersey psychiatric hospitals are made solely by hospital staff, without any independent or impartial review. By allowing the involuntary medication of Plaintiff's constituents without adequate due process protections, Defendants have flagrantly failed to minimize restrictions on the liberty of these people, as required by fundamental tenets of due process and human liberty. Defendants' pattern of failures has had a profoundly negative impact on the lives of thousands of residents of this State. Below are examples of individuals who have been severely damaged by Defendants' actions and omissions.

### A.    P.D.

121.    Constituent P.D. is a patient at Ancora Psychiatric Hospital, where he has been hospitalized since 2003, with a diagnosis of schizoaffective disorder. He was trained as a scientific glassblower at Salem Community College and worked making condensers and chemistry kits for a private company. He enjoys reading and writing, especially on spiritual,

theological and philosophical subjects.  He also likes drawing and art, and draws portraits with pencil and charcoal.

122.     At Ancora, P.D. has been given a panoply of psychotropic medications, including the antipsychotics Risperdal, Zyprexa, Haldol and Seroquel, Depakene (a mood stabilizing drug), and Lexapro (an antidepressant), which have caused him to experience a number of serious side effects.  P.D. describes taking Haldol to be like "torture," especially when he was given the drug by injection.  He experienced such severe akathisia (restlessness) from taking the prescribed medications that the skin on his legs was worn from constant pacing.  Because of the medications, he was unable to sleep, gained an abnormal amount of weight, became depressed, and experienced agonizing hunger.  He told staff repeatedly about these side effects, but usually his complaints were not addressed.

123.     The medications P.D. has been given have prevented him from doing the things he enjoys doing on a daily basis.  For example, when he takes the medications and tries to read, he cannot remember what he just read.  The physical effects of the medications also make it difficult for him to do his art work and writing.  P.D. was on refusing status for a long time, but orally took medication to avoid getting painful intramuscular injections.  When he was on refusing status, he always felt like he was being threatened by staff with injections of medication.

124.     P.D. was put on refusing status more than once without going through the Three-Step Process.  In fact, hospital staff never explained the Three-Step Process to him or told him that he can request an independent review of medication decisions.

**B.**     **A.H.**

125.     Constituent A.H. was a patient at Trenton Psychiatric Hospital from January to April 2010, and was diagnosed with schizophrenia.  She previously had attended hairdressing school and worked as a hairdresser for seven years and as a pharmacy technician at a hospital.

47

She was first treated for mental illness following her divorce in 2006.  At Trenton Psychiatric she was prescribed Abilify, a powerful antipsychotic medication, and after twice refusing the medication she was told that if she did not take it by mouth, she would be given the medication by intramuscular injection.  She was concerned about long-term side effects and the numbness in her hands and feet caused by the medication, and has problems with her vision that she did not have before taking the medication.  She preferred a lower dose of the medication and for it to be administered at night so it would not make her groggy during the day.

126.    A.H. did not know about her right to speak to the *Rennie* Advocate at Trenton Psychiatric until informed by DRNJ, and no hospital staff ever advised her about the Three-Step Process.  A.H. wanted to be advised if there were other medications that did not have potentially disabling side effects.  She ultimately signed a consent form for the drug Abilify, but noted next to her signature, "I hereby consent only under the condition of threat of forced injection."  A.H. was also involuntarily medicated by injection with antipsychotic drugs at Monmouth Medical Center, a private hospital.

**C.      S.L.**

127.    Constituent S.L. has been a patient at Hagedorn Psychiatric Hospital since 2007, with a diagnosis of schizoaffective disorder.  He has an associate's degree in general science with a particular knowledge of computer science and lived in his own apartment for over ten years.  He enjoys reading, especially books on religion, spirituality and theology, and is paid by Hagedorn to play piano for other patients during mealtimes.

128.    S.L. is on Conditional Extension Pending Placement ("CEPP") status, which means that he does not meet the standard for involuntary commitment and is healthy enough to be discharged.  He remains at Hagedorn only because the hospital has not yet found a place for

him to live in the community.  Thus, even though S.L. should not be in the hospital, he is subject to forced medication by hospital staff.

129.    At Hagedorn, S.L. has been given numerous psychotropic medications, including heavy daily doses of the antipsychotics Seroquel and Prolixin.  In fact, at Hagedorn, S.L. is being prescribed a daily dose of 40 mg of Prolixin, even though, according to the manufacturer's dosage guidelines, "controlled clinical studies have not been performed to demonstrate [the] safety of prolonged administration of such doses."[25]  The medications have caused him to experience a number of serious side effects.  For example, Prolixin gives him terrible handshakes and tremors and causes him to have trouble reading, concentrating, and remembering things.  He also did not like taking Seroquel as it did not help him and it made it difficult for him to sleep.

130.    S.L. has been on refusing status for almost three years but orally takes the medication to avoid painful intramuscular injections.  At Hagedorn on one occasion, he refused medication and was given a very painful intramuscular injection against his will.  He needed physical therapy and still experiences pain today from that incident.

131.    S.L. was never informed by hospital staff that he could speak with a *Rennie* Advocate regarding his refusal to be medicated.  In fact, Hagedorn has not even had a *Rennie* Advocate for the past two years.

**D.      A.R.**

132.    Constituent A.R. is a patient at Greystone who has been diagnosed with bipolar disorder and schizoaffective disorder.  He is also on CEPP status, and is currently given Depakene (a mood stabilizing drug), Cogentin (an anti-Parkinson's drug), Clonazepam (an anti-

---

[25]    *See* http://www.rxlist.com/prolixin-drug.htm at 2.

seizure medication), Inderal (an anti-tremor drug), and Seroquel (an antipsychotic drug) orally. He is also given a shot of Prolixin Decanoate (an antipsychotic) every fourteen days, against his will.  When he was admitted to Greystone, the staff rushed him through the process of signing many forms, among which were forms indicating his consent to take certain psychotropic medications, without adequately explaining to him the side effects of the medication.  Had he been informed of the painful side effects he later experienced as a result of the medication, A.R. would have been reluctant to give his consent.  Further, despite the fact that he is currently on refusing status, he was never informed by hospital staff about a *Rennie* Advocate.

133.    The prescribed medication causes A.R. numerous side effects, including uncontrollable bodily movements and shaking, lethargy, bouts of depression, swollen tongue (which makes it difficult and painful for him to talk, eat and drink), and difficulty controlling his bowel movements.   Greystone staff have not addressed his concerns over the painful side effects that he experiences.   Because of these side effects, he has on occasion refused to take the medication, but most of the time he complies, because he is threatened by hospital staff with injections of Haldol if he attempts to refuse.   A.R. knows this is a credible threat because recently he missed his morning medication due to oversleeping, and as a result he was pulled out of bed, roughly restrained, and injected with what he believes to have been Haldol every six hours for two weeks.

**E.**     **J.C.**

134.    Constituent J.C. studied economics at and graduated from Princeton University, where he completed a thesis titled "The Dual Role and Consequent Macroeconomic Implications of the New York Stock Exchange Specialist System."  He later worked as a stock broker.  J.C. has been a patient at Hagedorn and Ancora, has been given a diagnosis of chronic paranoid

schizoprenia, and has been prescribed powerful antipsychotic medication, including Risperdal and Zyprexa.

135.    J.C. has experienced severe side effects from the medication he has been given, including a persistent Parkinson's-like tremor of his hands, blurred vision, pounding headaches, fatigue, difficulties with movement, problems with memory and concentration, and problems with sexual functioning.  He discussed these side effects with his treating psychiatrists, but they did not adequately address his concerns.

136.    When J.C. was admitted to Hagedorn in November 2007, he was assessed as capable of giving consent.   Several months later, however, his status was changed to "functionally incompetent," even though he was refusing medication, in violation of A.B. 5:04.[26] A hospital psychiatrist completed only the first section of a Three-Step Form for J.C., completely bypassing the second and third steps of the Three-Step Process.

137.    J.C. has experienced forced injections of antipsychotic medication, which made him feel "like an animal."  Although he has refused medication because of the side effects, he has frequently taken medication by mouth to avoid painful intramuscular injections.

138.    The above examples represent only a few out of countless individuals whose rights have been violated and whose health has been jeopardized by Defendants' actions.

## VI.    The Three-Step Process Is Unconstitutional

139.    The Three-Step Process — as written and as applied — does not come close to satisfying contemporary standards of due process or equal protection.  In the three decades since

---

[26]  A.B. 5:04 states that the "functionally incompetent" designation applies only where:  "(a) Medication is a necessary part of the patient's treatment plan; and (2) The patient is unable, because of his/her illness, to give informed consent to the medication; and (3) The patient is not refusing the medication."  A.B. 5:04, Section IV.C.3(a).  J.C. refused medication and thus should not have been designated as functionally incompetent.

the Third Circuit's 1983 decision in *Rennie*, the law in this country has evolved towards providing greater procedural protection to individuals who are subject to forced medication.  On the federal level, twenty years ago, the Supreme Court held that prisoners with mental illness may not be involuntarily medicated unless they are provided notice and a hearing.  *Washington v. Harper*, 494 U.S. 210 (1990).    On the state level, a majority of the U.S. population lives in states where patients who refuse medication are provided with legal counsel and notice and a judicial hearing before they may be involuntarily medicated.  New Jersey has not kept pace with these developments.

140.    The Three-Step Process suffers from four serious constitutional deficiencies: (a) the lack of a judicial hearing prior to involuntary drug administration; (b) the lack of legal counsel; (c) the lack of reviews during the term of involuntary drug administration or time limits on involuntary medication orders; and (d) the lack of a requirement that the administering psychiatrist consider less intrusive treatments and side effects, which is an integral part of the exercise of professional judgment.

141.    Indeed, the United States Department of Justice recently concluded after a year-long investigation that numerous conditions and practices at Ancora, New Jersey's largest State psychiatric hospital with approximately 500 patients, violate the constitutional rights of patients.  In particular, DOJ found that "Ancora's policies and practices subject patients to an excessive risk of serious harm by (1) providing inadequate systems to identify and reduce risks of harm, (2) providing inadequate clinical management and nursing care, (3) failing to use restraints appropriately, and (4) failing to provide appropriate mental health assessments and treatment."  Letter from United States Department of Justice to Governor of New Jersey (August 19, 2009), at 2 (Ex. D).

A.      **Defendants Deprive Plaintiffs' Constituents of a Judicial Hearing Prior to the Involuntary Non-Emergency Administration of Psychotropic Drugs**

142.    The Three-Step Process violates patients' due process rights by denying patients an independent and impartial decision-maker in medication refusal decisions.  In New Jersey State psychiatric hospitals, a treating physician, the treatment team (of which the treating physician is a part) and the Medical Director of the hospital (who supervises the treating physician) alone decide whether a person can be involuntarily medicated.  None of these decision-makers is independent.  Even prisoners — as required by *Harper* — are afforded a hearing before a decision-maker not involved in the prisoner's treatment.

143.    By denying refusing patients judicial hearings as of right, the Three-Step Process violates the Due Process Clause of the Fourteenth Amendment, which guarantees civil litigants a fundamental right of access to the courts and a meaningful opportunity to be heard, and requires removal of obstacles to their full participation in judicial proceedings.  *See Tennessee v. Lane,* 541 U.S. 509, 532-34 (2004); *Boddie v. Conn.*, 401 U.S. 371, 379 (1971).

144.    Moreover, the Three-Step Process fails to provide for an independent and critical examination of the reasons to medicate or the patient's objections to the medication.  As applied, the Three-Step Process is merely a one-sided exercise in coercing the patient to take medication, because the patient has no ability or means to challenge the psychiatrist's diagnosis or medication decision.  Further, there is no requirement that the psychiatrist consult with a patient's pre-hospitalization psychiatrist or any other medical provider, family member, or friend who might have a good understanding of the patient and who might hold a view contrary to hospital staff regarding the use of medication or the type of medication.  Additionally, the Three-Step Process does not provide the patient with a hearing where she can question the psychiatrist on the need for involuntary medication, nor does it require the psychiatrist to share his

observations and diagnosis with the patient, nor does it provide the patient with an impartial decision-maker who is not part of her treatment team, or even part of the institution.

145.    By denying psychiatric patients their constitutional right to refuse unwanted psychotropic medication, New Jersey lags far behind other states.  In stark contrast, the majority of Americans live in jurisdictions that provide psychiatric patients with judicial hearings before they can be involuntarily medicated.  These states, from all regions of the country, include Alaska, California, Colorado, Connecticut, Delaware, Florida, Hawaii, Idaho, Illinois, Indiana, Kentucky, Massachusetts, Minnesota, Mississippi, Montana, New Hampshire, New Mexico, New York, North Dakota, Ohio, South Carolina, South Dakota, Texas, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming.  *See* ALASKA STAT. § 47.30.839 (2004); CAL. WELF. & INST. CODE § 5332 (2001); *Riese v. St. Mary's Hosp. & Med. Ctr.,* 271 Cal. Rptr. 199, 211 (Cal. Dist. Ct. App. 1987); *People v. Medina*, 705 P.2d 961, 963 (Colo. 1985) (en banc); CONN. GEN. STAT. ANN. § 17a-543 (2007); Del. Psychiatric Center Policy and Procedure Directive TX 24 (Sept. 27, 2007); FLA. STAT. ANN. § 394.467 (2009); HAW. REV. STAT. § 334E-2 (1984); IDAHO CODE ANN. § 66-322 (1981); 405 ILL. COMP. STAT. 5/2-107.1 (2007); *In re Mental Commitment of M.P.*, 510 N.E.2d 645, 647 (Ind. 1987); KY. REV. STAT. ANN. § 202A.196 (1988); MASS. GEN. LAWS ch. 123 § 8B (1992); MINN. STAT. ANN. § 253B.92 (1998); MISS. CODE ANN. § 41-21-73 (2004); Miss. Op. Atty. Gen. No. 94-0068, Zachary, March 2, 1994; MONT. CODE. ANN. § 53-21-127 (2003); N.H. REV. STAT. ANN. § 135-C:45-a (2006); N.M. STAT. ANN. § 43-1-15 (2009); N.Y. COMP. CODES R. & REGS. tit. 14, § 527.8 (2008); N.D. CENT. CODE. §25-03.1-18.1 (2003); *Steele v. Hamilton County Cmty. Mental Health Bd*., 736 N.E.2d 10, 21 (Ohio 2000); S.C. CODE ANN. § 44-66-30 (1992); S.D. CODIFIED LAWS § 27A-12-3.12 (1996); TEX. HEALTH & SAFETY CODE ANN. § 574.103 (2003); VT. STAT. ANN. TIT. 18 § 7624

(2007); VA. CODE ANN. §37.2-1101 (2009); WASH. REV. CODE § 71.05.215 (1991) (requiring

court order for medication if commitment is extended); W. Va. Code Ann. § 27-5-11 (2005)

(requiring court order in four of six judicial circuits); WIS. STAT. § 51.61 (2010); WYO. STAT.

ANN. §25-10-110 (2008).  These 29 states account for 64% of the U.S. population.  Additionally,

Maine, Maryland, Nebraska, Oregon, and Tennessee require administrative hearings, with input

from impartial decision-makers, before involuntary patients can be forcibly medicated.  *See* ME.

REV. STAT. ANN. tit. 34-B, § 3861(3) (2001); MD. HEALTH-GEN. CODE ANN. § 10-708 (2005);

NEB. REV. STAT. § 71-959 (1976); OR. ADMIN. R. 309-033-0640(3) (2010); and TENN. COMP. R.

& REGS. 0940-01-01-.08 (1985).  These additional five states account for 6% of the U.S.

population.  Thus, 70% of the people in this country live in states that provide greater due

process for patients in psychiatric hospitals than does New Jersey.[27]

146.   New Jersey, in failing to provide for judicial hearings for those who oppose

involuntary drugging, trails far behind other states.  In New York, for example, when a patient

refuses to consent to the administration of antipsychotic drugs on a non-emergency basis, there

***must*** be a judicial determination of whether the patient has the capacity to make a reasoned

decision with respect to proposed treatment before drugs may be administered over objection.

The patient ***must*** be afforded representation by counsel at the hearing (with counsel appointed

for the indigent), and the patient can be involuntarily medicated only if the state demonstrates by

***clear and convincing*** evidence the patient's incapacity to make a treatment decision and that the

proposed treatment is narrowly tailored to give substantive effect to the patient's liberty interest,

---

[27]   Utah has in-hospital medication review hearings, which still offer greater due process than New Jersey's Three-Step Process.  *See Utah State Hospital Operational Policy and Procedure Manual*, at 16-23, available at http://www.ush.utah.gov/pdf/USHOPP%20-%20Special%20Tx%20Procedures.pdf.

taking into consideration all relevant circumstances, including the patient's best interests, the benefits to be gained from the treatment, the adverse side effects associated with the treatment, and any less intrusive alternative treatments. *See Rivers v. Katz*, 67 N.Y.2d 485, 497 (N.Y. 1986).

147.    In Connecticut, a psychiatric patient can be involuntarily medicated only when: (1) a mental health professional not employed by the facility ***and*** jointly appointed by the patient's advocate and the facility decides that the patient needs medication; (2) the Probate Court finds by clear and convincing evidence that the patient is incapable of giving informed consent to medication for the treatment of his psychiatric disability and appoints a conservator; or (3) the Probate Court finds that by clear and convincing evidence that (i) the patient is capable of giving informed consent but refuses to consent to medication for treatment of the patient's psychiatric disabilities, (ii) there is no less intrusive beneficial treatment, and (iii) without medication, the psychiatric disabilities with which the patient has been diagnosed will continue unabated and place the patient or others in direct threat of harm. *See* CONN. GEN. STAT. ANN. § 17a-543.

148.    In other jurisdictions such as Texas, absent an emergency, an involuntary patient may not be forcibly medicated without a court order. TEX HEALTH & SAFETY CODE ANN. § 574.103(b).  There must be a hearing, with counsel, in order to determine whether clear and convincing evidence shows that the patient is incapable of making a decision regarding medication and whether treatment with the proposed medication is in the patient's best interest. *Id*. § 574.105-574.106.  The patient is also entitled to request an independent expert to testify on her behalf.   *Id*. § 574.105(6).   Many other states have provisions similar to New York, Connecticut and Texas.

**B.**     **Defendants Deprive Plaintiffs' Constituents of Legal Counsel Prior to the Involuntary Non-Emergency Administration of Psychotropic Drugs**

149.     The Three-Step Process does not provide for anyone to support the desires of the patient regarding medication, and does not furnish the patient with an attorney to bring a challenge in court in the event that she wishes to contest treatment over objection.  Further, the *Rennie* Advocate's position in the hospital's chain of command deprives the patient of a truly independent advocate, because the *Rennie* Advocate works for the hospital and is not required to advocate for the expressed desire of the patient.  The inadequacy of the *Rennie* Advocates is also shown by the fact that virtually no independent psychiatric reviews have been conducted during the last decade.  In reality, the Three-Step Process is frequently completed and medication administered forcibly, before the *Rennie* Advocate even receives the paperwork, much less meets with the patient.

150.     Without a court-appointed lawyer, a New Jersey psychiatric patient has no ability to exercise her right to refuse medication.  As one court put it:

> The average patient residing in a mental institution is not capable of mastering the changing legal standards and developments in mental health law and evaluating how these changes might affect his or her rights. The effects of confinement, particularly the debilitating effects of the drugs routinely administered at mental institutions, present tremendous obstacles which limit the patients' abilities to utilize [] review procedures and assert his or her rights.

*Streicher v. Prescott*, 663 F. Supp. 335, 343 (D.D.C. 1987).

151.     Not only do Plaintiff's constituents lack access to lawyers or real advocates prior to being involuntarily drugged, they — unlike inmates in New Jersey prisons — have no access to law libraries or legal materials to challenge medication decisions on their own.  *See* Section IV.A above.  The Supreme Court has affirmed the obligation of correctional officials to provide prison inmates with access to the courts either by providing a law library, a law clerk or a legal services agency to insure that prison inmates can protect their rights.  *See Lewis v. Casey*, 518

U.S. 343 (1996).  Psychiatric patients have the same rights.  *See Ward v. Cort*, 762 F. 2d 856, 859 (10th Cir. 1985) (psychiatric patient had right to meaningful access to court, which state hospital violated by not providing any law library facilities and by providing legal services through private law firm that were inadequate).

152.    The states that require a judicial decision-maker for involuntary medication decisions also typically provide psychiatric patients with legal representation in those hearings. Most commonly, as in Texas for example, state statutes require that counsel be appointed for indigent patients.  *See, e.g.*, TEX. HEALTH & SAFETY CODE ANN. § 574.105.  In New York, patients are represented in medication refusal hearings by attorneys from the Mental Hygiene Legal Service, which also represents patients in commitment hearings.  Critically, these attorneys must advocate for their clients' desires, unlike the *Rennie* Advocates presently employed in New Jersey hospitals, who typically side with their hospital colleagues.

153.    New Jersey psychiatric patients — including Plaintiff's constituents — have an absolute right to counsel in civil commitment proceedings.  *See* N.J. Ct. R. 4:74-7.  Yet, the vast majority of people committed to New Jersey psychiatric hospitals are indigent and require appointed counsel.  Lawyers from the New Jersey Division of Mental Health Advocacy ("DMHA"), part of the New Jersey Public Advocate's office, represent these patients in commitment hearings and are statutorily authorized to — and should — represent these same patients in medication refusal hearings.  These attorneys have not done so, however, because the Three-Step Process does not provide for hearings and thus there are no hearings for DMHA attorneys to attend.

154.    Patients are entitled to legal representation and a judicial hearing before they can be involuntarily committed to a psychiatric hospital, and there is no reason why the State cannot

provide legal representation and a judicial hearing before involuntarily medicating a patient with psychotropic medication.

155.   In order for the right to refuse medication to have any meaning, patients who object to medication must be provided competent lawyers who have specialized training in psychiatric and medication practices.   Minimal standards of competence require that these lawyers interview their clients before hearings, thoroughly investigate the facts, and be present during any court-ordered mental health examination of their client.   *See In the Matter of the Mental Health of K.G.F.*, 29 P.3d 485 (Mont. 2001).

**C.   Defendants Deprive Plaintiffs' Constituents of Meaningful Review of the Involuntary Non-Emergency Administration of Psychotropic Drugs**

156.   It is well settled that New Jersey psychiatric hospitals have a constitutional obligation to provide an independent and impartial review of an involuntary medication decision. *See Brandt*, 626 F. Supp.2d at 491-92. Yet the Three-Step Process does not include any independent or impartial review.   Further, once a patient goes through the Three-Step Process, she can be forcibly medicated indefinitely and the dosage and type of medication can be changed without any due process.   Moreover, there are no standards governing the duration, or dosage, of the medication. There is not even a requirement that the dosage meet Food and Drug Administration guidelines, nor is there any requirement that medication cease after any medically recognized standard of time that would indicate whether or not the medication was effective.   After a patient undergoes the Three-Step Process, the authority to forcibly medicate her lasts as long as the patient is in the hospital, which could be years or decades, because many patients in state psychiatric hospitals are long-term patients.

157.   Further, in New Jersey, patients face a stiff penalty for exercising their constitutional rights.   Those brave enough to assert their right to refuse medication are typically

forced to stay in the hospital longer, perhaps indefinitely, because a patient's refusal of medication is often used by staff to justify involuntary commitment.

158.    Contemporary standards of due process, as followed by other states, require meaningful periodic review of medication decisions and the setting of precise time limits on involuntary medication.  In Connecticut, for example, if the Court appoints a conservator for an incompetent patient or orders medication of a patient who is capable of consent, the authority to consent for the patient may last for a maximum of one hundred twenty days.  CONN. GEN. STAT. ANN. § 17a-543.  In Illinois, the court's involuntary medication order expires after ninety days and may be renewed only after a new judicial hearing.  405 ILL. COMP. STAT. 5/2-107.1(a-5)(5).

###    D.    Defendants Fail to Exercise Professional Judgment in Medication Practices

159.    The Due Process Clause of the Fourteenth Amendment requires, at a minimum, that psychiatrists employed by the State exercise professional judgment in medication decisions. *Youngberg*, 457 U.S. at 324.  But the professional judgment standard does not require carte blanche deference to psychiatrists' decisions.  *See Brandt*, 626 F. Supp.2d at 476 (citing *Rennie v. Klein*, 720 F.2d at 270 n.8).  On the contrary, "[m]edical authorities may administer treatment only as 'necessary to prevent the patient from endangering himself or others,' and the exercise of professional judgment may require them to consider available alternatives in the context of such factors as the harmful side-effects that a patient may experience."  *Brandt*, 626 F. Supp.2d at 476 (quoting *Rennie v. Klein*, 720 F.2d at 269-70).

160.    In New Jersey, lack of professional judgment is shown by the fact that psychiatric hospitals administer excessive dosages of psychotropic medications, engage in the unjustified use of polypharmacy, and routinely exclude patients from participating in decisions regarding their own treatment.  In fact, the Three-Step Process is sometimes completed without the psychiatrist or the treatment team engaging in any meaningful discussion with the patient.

Indeed, patients who refuse psychiatric medication often do so for very good reasons:  they know that the medication being offered does not help them, they are prescribed the wrong medication, they want a lower dosage, they want a *different* medication (one that has worked for them successfully in the past), or they are seeking to avoid painful side effects.

161.    Under the Three-Step Process, the involuntary administration of medication is not primarily guided by the clinical interests of the patient, the safety of the patient or others, or the preferences of the patient in avoiding unwanted side effects.  Instead, the very terms of A.B. 5:04 state that expediency can trump patients' rights, as forced medication can be justified by the belief of hospital staff that "a treatment plan which includes medication would probably improve the patient's condition within a significantly shorter time period" than one that does not include medication.  A.B. 5:04, Section II.B.2(a).

162.    An individual's constitutional rights may not be taken away, however, for the convenience of staff or based on a psychiatrist's belief that a patient's treatment might proceed faster were the patient involuntarily medicated.  In *Brandt*, the Court held that "medical authorities may medicate involuntarily committed patients against their will only in an *imminent or reasonably impending* emergency."  *Brandt*, 626 F. Supp.2d at 489.

163.    Under the Three-Step Process, psychiatrists are not required to consider less intrusive treatment measures, such as a lower dosage of medication, different medication, or no medication at all.  The fact that psychiatrists are not obligated by the State to even consider utilizing less intrusive means or side effects in deciding whether or not to override a person's desire to refuse medication violates patients' due process rights.  *See Sell*, 539 U.S. at 179-80.

## VII.    Providing Due Process Will Benefit Patients' Treatment

164.    Not only is the right to refuse medication a fundamental due process right, it is in the State's interest to have each patient embrace the treatment that is offered.  A patient who fails

to invest himself in her own recovery will not recover, and coercion without legal recourse is not likely to promote recovery.  All too frequently, patients become noncompliant with medication once they are discharged from the hospital because there is no one to force them to take it, and they subsequently return to the hospital.  On the other hand, if a patient participates in treatment decisions and is not coerced into taking medication, she may be more likely to continue to adhere to her treatment plan after discharge from the hospital.

165.    Giving patients choices by honoring their constitutional right to refuse treatment can have important beneficial effects on long-term treatment and honor their human dignity.  Choice in matters of treatment works better than coercion because self-determination promotes commitment, intrinsic motivation, satisfaction, and effective functioning.  Bruce Winick, *The MacArthur Treatment Competence Study:  Legal and Therapeutic Implications*, 2 PSYCHOL. PUB. POL'Y & L. 137, 158-61 (1996).  Indeed, even the American Psychiatric Association recognizes that the judicial review procedure followed by many states may add strength and dignity to the involuntarily committed patient's liberty interests in refusing administration of unwanted medication, may provide specific criteria upon which to base the decision to administer medication over the patient's objection, and may encourage further discussions between the psychiatrist and patient.[28]

166.    Clinical research conducted over the last three decades has shown that providing psychiatric patients with more choice — and using less coercive measures — in medication decisions promotes treatment goals.  For example, a study published in *Psychiatry Research* in June 2010 concluded that patients who participated in medication decisions had lower illness

---

[28]    *See* http://archive.psych.org/edu/other_res/lib_archives/archives/199110.pdf.

severity, better therapeutic alliance ratings, more positive attitudes towards treatment and better insight into their illness.  Johannes Hamann et al., *Patient Participation in Antipsychotic Drug Choice Decisions*, 178 PSYCHIATRY RES. 63 (June 2010).  Further, a study published in the journal *Psychiatric Services* in March 2010 concluded that patients who reported that they experienced less coercion (including forced medication) were more satisfied with their treatment, and thus less at risk of involuntary readmissions.  Christine Katsakou, et al., *Coercion and Treatment Satisfaction Among Involuntary Patients*, 61 PSYCHIATRIC SERVS. 286 (March 2010).  Additionally, a study published in 1999 in *Psychiatric Services* concluded that patient satisfaction with treatment was correlated with fewer readmissions and fewer days readmitted.  Benjamin Druss, Robert Rosenheck and Marilyn Stolar, *Patient Satisfaction and Administrative Measures as Indicators of the Quality of Mental Health Care*, 50 PSYCHIATRIC SERVS. 1053, 1056 (August 1999).

167.    Moreover, a study published in the *International Journal of Law and Psychiatry* in 1997 concluded that coercive treatment arouses negative feelings in patients, creates negative expectations about the outcome of the treatment, fails to result in a trusting treatment relationship between the patient and medical professionals, and is related to worse treatment outcomes.  Riittakerttu Kaltiala-Heino, Pekka Laippala and Raimo Salokangas, *Impact of Coercion on Treatment Outcome*, 20 Int'l J. Law & Psychiatry 311 (Summer 1997).  Additionally, a study published in the *American Journal of Psychiatry* in 1991 concluded that, for state hospital patients, involuntary medication does not appear to enhance insight or cooperation or result in rapid return to the community.  Francine Cournos, Karen McKinnon and Barbara Stanley, *Outcome of Involuntary Medication in A State Hospital System*, 148 AM. J. PSYCHIATRY 489 (April 1991).  Finally, Dr. Paul Appelbaum observed that research on coercion

in psychiatric treatment has shown that "[t]o the extent that subjects felt they had a voice in the process, they felt less coerced," and that a decrease in the use of coercive practices is associated with an improvement in the accuracy of diagnosis, and an increase in adherence to treatment. Paul Appelbaum, *Commentary*, *in* MOVING FROM COERCION TO COLLABORATION IN MENTAL HEALTH SERVICES (David Pollack ed., 2004).[29]

168.    Research has also shown that providing judicial hearings can have therapeutic benefits for patients.  A study published in the journal *Hospital and Community Psychiatry* in 1988, two years after New York instituted judicial oversight of medication refusal hearings, concluded that the hearings did not delay treatment in a large state hospital, and that judicial review promoted a better understanding by clinicians of the legal basis for involuntary medication and greater patient participation in the review procedure.  Francine Cournos, Karen McKinnon and Carole Adams, *A Comparison of Clinical and Judicial Procedures for Reviewing Requests for Involuntary Medication in New York*, 39 HOSP. & CMTY. PSYCHIATRY 851, 855 (Aug. 1988).

169.    Another study showed that medication refusers, once discharged from the hospital, spent longer outside the hospital before being readmitted than those who did not refuse medication.  The refusers' success may have been result of a "healthy skepticism" that they retained "about doctors, medicine and psychiatry and some sense of themselves as not without power and control over their lives."  Irwin Hassenfeld and Barbara Grumet, *A Study of the Right to Refuse Treatment*, 12 BULL. AM. ACAD. PSYCHIATRY & L. 65, 72 (1984).

---

[29]    Available at http://mentalhealth.samhsa.gov/publications/allpubs/sma04-3869/Commentary.asp.

170.    Giving effect to the right to refuse treatment also ensures that medication is not being administered as a means of punishment or convenience, and improved protection from the administration of inappropriate medications or dosages causing severe side effects.  Indeed, a study of long-term psychiatric patients found that "capable patient involvement is an important check on a physician's judgment."   Steven Hoge & Thomas Feucht-Haviar, *Long-Term, Assenting Patients:  Decisional Capacity and the Quality of Care*, 23 BULL. AM. ACAD. PSYCHIATRY & L. 343, 349 (1995).  Another study found that having right-to-refuse hearings and making patients aware of their right to refuse treatment is "undoubtedly beneficial, considering the long-standing belief that an active role in the therapeutic alliance between patient and therapist will be worthwhile."  Julie Zito et al., *The Treatment Review Panel: A Solution to Treatment Refusal?*, 12 BULL. AM. ACAD. PSYCHIATRY & L. 349, 357 (1984).

171.    Moreover, experience from New Jersey's own past practices shows that external review of forced medication decisions protects patients and results in better treatment, whereas the Three-Step Process does not.  As the New Jersey Public Advocate argued to the Supreme Court twenty years ago:

> In New Jersey a system of internal peer review . . . has proven ineffective in ensuring that medication refusals are carefully reviewed. . . . [E]xternal review of medication refusals resulted in the total discontinuation or the reduction of medication in 59% of the cases where state hospital patients refused prescribed anti-psychotic medication.  In stark contrast, purely internal peer review resulted in a total discontinuation or a reduction of dosage in a mere 2.47% of the refusal cases.  Thus, only external review reduces the risk of harm and the risk of error to constitutionally acceptable levels.   External review is not unduly costly or burdensome, does not disrupt institutional order and results in improved quality of care and treatment.

Brief for the New Jersey Department of the Public Advocate as Amicus Curiae in Support of Respondent at 6, *Washington v. Harper*, 494 U.S. 210 (1990) (No. 88-599).[30]   The Public Advocate's conclusions have continued relevance today.

172.    Finally, providing medication refusal hearings might ultimately be more cost-effective for the State because there could be a savings on unnecessary medication.  *See Brandt*, 626 F. Supp.2d at 487.

## COUNT I

### (Against All Defendants)

### Violations of the Due Process Clause of the Fourteenth Amendment of the United States Constitution

173.    Plaintiff repeats and realleges each Paragraph of this Complaint as if set forth at length herein.

174.    Defendant Department of Human Services operates and funds State and County hospitals that allow the forcible, non-emergency medication of psychiatric patients pursuant to the Three-Step Process.

175.    Defendant DHSS licenses hospitals that allow the forcible, non-emergency medication of psychiatric patients pursuant to the Three-Step Process.

176.    Defendants' actions and omissions, as described in this Complaint, are carried out under the color and pretense of New Jersey state law.

---

[30]   In ruling that a peer review system similar to the Three-Step Process was unconstitutional, the Supreme Court in *Harper* cited to the Public Advocate's brief, noting that "New Jersey's review of involuntary psychotropic medication in mental institutions is instructive."  *Harper*, 494 U.S. at 251 n.22.

177.    Defendants' actions and omissions violate the rights of Plaintiff's constituents, guaranteed by the Due Process Clause of the Fourteenth Amendment of the United States Constitution.  Such rights are enforceable under 42 U.S.C. § 1983 (1996).

178.    Such violations include, but are not limited to, the denial of constituents' rights to refuse psychotropic medication, to freedom from unwanted bodily intrusions, to due process in medication decisions, and to be treated by clinicians exercising professional judgment.

179.    Defendants fail to comply with the regulations set forth in the Three-Step Process by, *inter alia*, failing to notify patients of their right to refuse medication and the existence of a *Rennie* Advocate and by not actually completing each of the three steps for each patient who refuses medication.  Even were Defendants to comply fully with the written requirements of the Three-Step Process, constituents' due process rights would not be adequately protected.

180.    The Three-Step Process violates contemporary standards of due process because:

(a)    it allows the forcible medication of patients who are competent to make medical decisions;

(b)    it allows the forcible medication of patients without a finding that the patients would pose a danger to themselves or others without medication;

(c)    there is no legal representation provided to the patient;

(d)    there is no truly independent psychiatric examination of patients who refuse medication;

(e)    there is no notice provided to the patient;

(f)    there is no right to confrontation;

(g)    there is no decision by an impartial decision-maker who is independent of the hospital and Defendants' supervision;

(h)    there is no limit to the length of time a patient can be forcibly medicated;

(i)    there is no requirement limiting the type or dosage of medication with which a patient can be forcibly drugged;

(j)    there is no meaningful review of involuntary medication decisions; and

(k)     patients have no realistic means of appealing involuntary medication decisions.

181.    In addition, Defendants have violated constituents' due process rights by failing to exercise professional judgment in their treatment of constituents, as evidenced by institutions' medication errors and psychiatrists' failure to consider utilizing less restrictive means of treatment and reasons why patients might refuse medication, including concerns regarding debilitating side effects.

182.    Further, Defendants retaliate against patients who exercise their right to refuse medication by subjecting them to longer hospital commitments than patients who do not refuse medication.

## COUNT II

### (Against All Defendants)

### Violations of the Right of Access to the Courts

183.    Plaintiff repeats and realleges each Paragraph of this Complaint, and each Paragraph of Count I above, as if set forth at length herein.

184.    Defendant Department of Human Services operates and funds State and County hospitals that allow the forcible, non-emergency medication of psychiatric patients without providing those patients judicial hearings.

185.    Defendant DHSS licenses hospitals that allow the forcible, non-emergency medication of psychiatric patients without providing those patients judicial hearings.

186.    Defendants' actions and omissions, as described in this Complaint, are carried out under the color and pretense of New Jersey state law.

187.    All persons enjoy a constitutional right of access to the courts under the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment.

188.    The right of access to the courts for psychiatric patients challenging the conditions of their confinement includes physical access to a courtroom and judge as well as access to an adequate law library.  These rights are enforceable under 42 U.S.C. § 1983.

189.    Defendants' actions and omissions violate Plaintiff's constituents' constitutional right of access to the courts because Plaintiff's constituents lack access to judicial hearings prior to the involuntary non-emergency administration of psychotropic medication and — unlike inmates in New Jersey prisons — have no access to law libraries or legal materials to challenge medication decisions on their own.

## COUNT III

### (Against All Defendants)

### Violations of the Right to Counsel

190.    Plaintiff repeats and realleges each Paragraph of this Complaint, and each Paragraph of Counts I-II above, as if set forth at length herein.

191.    Defendant Department of Human Services operates and funds State and County hospitals that allow the forcible, non-emergency medication of psychiatric patients without providing those patients legal counsel.

192.    Defendant DHSS licenses hospitals that allow the forcible, non-emergency medication of psychiatric patients without providing those patients legal counsel.

193.    Defendants' actions and omissions, as described in this Complaint, are carried out under the color and pretense of New Jersey state law.

194.    The overwhelming majority of patients in New Jersey State psychiatric hospitals are indigent and thus lack the resources to retain their own counsel.

195.    All persons challenging the conditions of their confinement enjoy a constitutional right to legal counsel under the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment.  This right is enforceable under 42 U.S.C. § 1983.

196.    Defendants' actions and omissions violate Plaintiff's constituents' constitutional right to counsel because Plaintiff's constituents lack access to legal counsel prior to the involuntary non-emergency administration of psychotropic medication.

## COUNT IV

### (Against All Defendants)

### Violations of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution

197.    Plaintiff repeats and realleges each Paragraph of this Complaint, and each Paragraph of Counts I-III above, as if set forth at length herein.

198.    Defendant Department of Human Services operates and funds State and County hospitals that allow the forcible, non-emergency medication of psychiatric patients without providing those patients a fair hearing.

199.    Defendant DHSS licenses hospitals that allow the forcible, non-emergency medication of psychiatric patients without providing those patients a fair hearing.

200.    Defendants' actions and omissions, as described in this Complaint, are carried out under the color and pretense of New Jersey state law.

201.    The Equal Protection Clause of the Fourteenth Amendment requires that the government treat all similarly situated people alike.  Violations of the Equal Protection Clause are actionable under 42 U.S.C. § 1983.

202.    Defendants have treated Plaintiff's constituents — individuals in psychiatric hospitals diagnosed with a mental illness — differently than people with medical conditions,

prison inmates with mental illness, and individuals who have a developmental disability as well as a mental illness.  For example, Plaintiff's constituents, unlike the three other similarly situated groups, are not provided hearings before being forcibly medicated and are entitled to at least as many rights as these groups.

203.    Defendants intentionally created a system in which Plaintiff's constituents are given fewer rights than people with medical conditions, prison inmates with mental illness, and individuals who have a developmental disability as well as a mental illness.

204.    Defendant Department of Human Services operates both developmental centers and psychiatric hospitals but only individuals in developmental centers receive court hearings before they may be involuntarily medicated with psychotropic drugs.

205.    There is no rational basis for Defendants' unequal treatment of patients in psychiatric hospitals, people with medical conditions, prison inmates with mental illness, and individuals who have a developmental disability as well as a mental illness.  Involuntary medication implicates the same constitutional concerns for individuals in each group, and any state interest in forced medication is the same for individuals in each group.

## COUNT V

### (Against All Defendants)

### Violations of the First Amendment

206.    Plaintiff repeats and realleges each Paragraph of this Complaint, and each Paragraph of Count I-IV above, as if set forth at length herein.

207.    The First Amendment's protection of free speech also protects freedom of thought.

208.    By forcing individuals to take mind-altering drugs against their will, Defendants forcibly change the ability of such individuals to formulate particular thoughts.  The involuntary

administration of psychotropic drugs affects patients' mental processes, interfering with their freedom of thought.

209.    Any infringement on a fundamental right such as the freedom of thought must be narrowly tailored to serve a compelling government interest.  New Jersey's forced medication practices are not narrowly tailored and do not serve any compelling government interest.

## COUNT VI

### (Against All Defendants)

### Violations of the Americans with Disabilities Act

210.    Plaintiff repeats and realleges each Paragraph of this Complaint, and each Paragraph of Counts I-V above, as if set forth at length herein.

211.    Defendant Department of Human Services operates and funds State and County hospitals that allow the forcible, non-emergency medication of psychiatric patients without providing those patients legal counsel and judicial hearings.  The Department of Human Services also operates developmental centers for individuals with developmental disabilities, who may not be involuntarily medicated with psychotropic drugs without a judicial hearing.  Psychiatric patients are denied the right to a judicial hearing based solely on their disability.

212.    Defendant DHSS licenses hospitals that allow the forcible, non-emergency medication of psychiatric patients without providing those patients legal counsel and judicial hearings.  DHSS also licenses hospitals where medical patients may not be involuntarily treated without a judicial hearing.

213.    Title II of the ADA prohibits discrimination against people with disabilities by "public entities."  For the purposes of Title II of the ADA, "the term 'public entity' means (A) any state or local government; [or] (B) any department, agency, special purpose district, or other

72

instrumentality of a State or States or local government . . . ."  42 U.S.C. § 12131(1)(A) & (B) (1990).

214.    Defendants are state actors who either operate State hospitals or provide the licensing for public hospitals, both of which are activities that constitute public entities of a State within the meaning of 42 U.S.C. § 12131(1)(A) & (B).

215.    Plaintiff's constituents have mental disabilities within the meaning of 42 U.S.C. § 12102(2) (2008) and are qualified individuals with disabilities within the meaning of 42 U.S.C. § 12131(2).

216.    Title II of the ADA provides that:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132 (1990); *see also* 28 C.F.R. § 35.101 *et seq*. (1991).

217.    Further, as public entities, Defendants may not:

> (ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;
>
> (iii)  Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided others; [or]
>
> (vii) Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

28 C.F.R. § 35.130(b)(ii), (iii), & (vii) (2010).

218.    Defendants, by their actions and omissions complained of herein, have violated and continue to violate Plaintiff's constituents' rights, secured by Title II of the ADA, 42 U.S.C. § 12132, and the regulations promulgated thereto, 28 C.F.R. Pt. 35, and 28 C.F.R. Pt. 36, App.

A, by, *inter alia*, denying constituents their right to participate in treatment, to refuse unwanted psychotropic drugs, and to judicial process and legal counsel.

219.    Further, in New Jersey, people who have been diagnosed with a mental illness are deprived of the right to give or withhold informed consent, whereas individuals with other diagnoses are accorded the right to give or withhold informed consent for treatment.   For example, a diabetic who refuses an amputation is provided a hearing before such a procedure can occur and a person with a communicable disease gets a hearing before she can be quarantined. The fact that the State has singled out people with mental illness as unworthy of due process constitutes discrimination based on disability.

<u>COUNT VII</u>

**(Against All Defendants)**

**Violations of the Rehabilitation Act**

220.    Plaintiff repeats and realleges each Paragraph of this Complaint, and each Paragraph of Counts I-VI above, as if set forth at length herein.

221.    Section 504 of the Rehabilitation Act of 1973 provides, "[n]o otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . .." 29 U.S.C. § 794(a) (2002).

222.    A "program or activity" is defined, in pertinent part, as "a department, agency, special purpose district, or other instrumentality of a State or of a local government; or the entity of such State or local government that distributes such assistance and each such department or agency (and each other . . .  local government entity) to which the assistance is extended, in the case of assistance to a State or local government;. . . [or] an entire corporation, partnership, or

other private organization...which is principally engaged in the business of providing...health care." 29 U.S.C. §§ 794(b)(1)(A), 794(b)(1)(B), & 794(b)(3)(A)(ii).

223.    Defendants are "program[s] or activit[ies]" as defined by 29 U.S.C. § 794(b)(1).

224.    Plaintiff's constituents have mental disabilities within the meaning of 29 U.S.C. § 705(20) (2008).

225.    Defendants, by their actions and omissions complained of herein, have violated and continue to violate the rights of all constituents secured by the Rehabilitation Act, 29 U.S.C. § 794 and the regulations promulgated thereto, 28 C.F.R. Pt. 41 and 45 C.F.R. Pt. 84, by limiting and continuing to limit their enjoyment in the rights, privileges, advantages, and opportunities that are enjoyed by other recipients of public programs when receiving aid, benefit, or service. Such violations include, but are not limited to, the failure to allow Plaintiff's constituents to exercise their rights to participate in treatment, to refuse unwanted psychotropic drugs, and to judicial process and legal counsel.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff, Disability Rights New Jersey, respectfully requests the following relief:

1.    Adjudge and declare that Defendants' actions and omissions, as described herein, violate Plaintiff's constituents' rights under the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution, Plaintiff's constituents' right of access to the courts and right to counsel under the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment, and Plaintiff's constituents' right to freedom of thought under the First Amendment;

2.    Adjudge and declare that Defendants' actions and omissions, as described herein, violate Plaintiff's constituents' rights under Title II of the Americans with Disabilities Act, 42

U.S.C. § 12101, *et seq*., the Rehabilitation Act, 29 U.S.C. § 794, and the regulations promulgated thereto;

3.   Issue a permanent injunction requiring that Defendant Velez prohibit the non-emergency, involuntary administration of psychotropic medication in State and county psychiatric hospitals without court order, and only allow medication to be administered in the manner required by the Due Process and Equal Protection Clauses of the United States Constitution;

4.   Issue a permanent injunction requiring that Defendant Alaigh prohibit the licensing of hospitals that allow the administration of non-emergency, involuntary administration of psychotropic medication without court order, and only allow medication to be administered in those hospitals in the manner required by the Due Process and Equal Protection Clauses of the United States Constitution;

5.   Issue a permanent injunction requiring Defendants to provide Plaintiff's constituents with the appropriate professional judgment when attending to the treatment of these individuals, as required under the Due Process and Equal Protection Clauses of the United States Constitution, Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act and the regulations promulgated thereto;

6.   Issue a permanent injunction requiring Defendants, within thirty days of its issuance, to submit to Plaintiff and to this Court for approval, a plan and schedule for ensuring that New Jersey hospitals are operated in compliance with the Due Process and Equal Protection Clauses of the United States Constitution, Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act and the regulations promulgated thereto.  Such a plan and schedule shall include, but not be limited to:

(a)    ensuring that when a patient refuses to consent to the administration of psychotropic drugs on a non-emergency basis, there is a judicial hearing to determine whether the patient is competent to make medical decisions before any such drugs may be administered;

(b)    ensuring that patients who refuse the administration of psychotropic drugs on a non-emergency basis are afforded representation by counsel at said hearing;

(c)    ensuring that a system for appointing experienced and knowledgeable counsel for refusing patients is established, and that such counsel be required to advocate for their clients' desires and receive training about psychiatric practices;

(d)    ensuring that independent expert witnesses are appointed for patients upon request;

(e)    ensuring that patients may be involuntarily medicated on a non-emergency basis *only* if the state demonstrates by clear and convincing evidence that the patient lacks competence to make medical decisions and that the proposed treatment is narrowly tailored to give substantive effect to the patient's liberty interests, taking into consideration all relevant circumstances, including the patient's best interests, the benefits to be gained from the treatment, the adverse side effects associated with the treatment, and any less intrusive alternative treatments;

(f)    ensuring that all staff in New Jersey hospitals are trained in the proper and legal use of psychotropic medication;

(g)    ensuring that Defendants provide monthly reports to Plaintiff that include information such as the number of individuals involuntarily medicated, their names, medications prescribed and dosages, review of involuntarily medicated

patients, and other information the Plaintiff may require pursuant to its federal mandates;

7.   Grant to the Plaintiff its costs, expenses, and, pursuant to 42 U.S.C. § 1988, its reasonable attorney fees.

8.   Grant to the Plaintiff any other relief that this Court may deem just and proper.

Dated:  Trenton, New Jersey
        August 3, 2010

s/ William Emmett Dwyer
William Emmett Dwyer                    Robert Cohen (*pro hac vice* pending)
Disability Rights New Jersey, Inc.      Shiva Farouki (*pro hac vice* pending)
210 South Broad Street, Third Floor     Michael D. Reisman (*pro hac vice* pending)
Trenton, NJ 08608                       Alexandra P. Kolod  (*pro hac vice* pending)
Tel:  (609) 292-9742                    Kirkland & Ellis LLP
Fax: (609) 777-0187                     601 Lexington Avenue
                                        New York, New York 10022
                                        Tel:  (212) 446-4800
                                        Fax:  (212) 446-6460

*Attorneys for Plaintiff Disability Rights New Jersey, Inc.*

**Certification Pursuant to Local Rule 201.1(d)(2)(A)**

William Emmett Dwyer certifies as follows:

      The within civil action is based on an alleged violation of a right secured by the

Constitution of the United States.

BY:    <u>s/ William Emmett Dwyer</u>
        William Emmett Dwyer, Esq.
        Attorney for Plaintiff
        Disability Rights New Jersey, Inc.
        210 South Broad Street, Third Floor
        Trenton, NJ 08608
        Tel:  (609) 292-9742
        Fax: (609) 777-0187

Dated:  Trenton, New Jersey
        August 3, 2010

## Certification of No Other Action

William Emmett Dwyer certifies as follows:

This matter is not the subject of any other action pending in any other court and is likewise not the subject of any pending arbitration proceeding or administrative proceeding.


BY:    <u>s/ William Emmett Dwyer</u>
        William Emmett Dwyer, Esq.
        Attorney for Plaintiff
        Disability Rights New Jersey, Inc.
        210 South Broad Street, Third Floor
        Trenton, NJ 08608
        Tel:  (609) 292-9742
        Fax: (609) 777-0187

Dated: Trenton, New Jersey
       August 3, 2010